# WATERS–PIERCE OIL COMPANY *v.* DESELMS.

## ERROR TO THE SUPREME COURT OF THE TERRITORY OF OKLAHOMA.

No. 62.　Argued January 8, 1909.—Decided February 1, 1909.

In the construction of a statute a superfluous negative may be omitted where the meaning is apparent, as in this case.

Where the subject is within the power of the State it is not within the province of the judiciary to disregard statutory standards on the ground that the legislature did not act wisely in enacting them.

Provisions for unequal punishment of corporations and individuals for violations of the same statute, *held,* in regard to the Oklahoma Territory Oil Inspection Law, to be separable, and, even if unconstitutional, not to affect the prohibitions contained in the statute against the use of oil not conforming to the standards fixed thereby.

Under the circumstances of this case, this court will not hold that the Supreme Court of Oklahoma erred in judicially noticing a custom in the Territory to use coal oil in kindling fires.

While the burden on the plaintiff is not satisfied by showing an accident and an injury, where there was adequate proof to show that an explosion occurred which could only have occurred by the unlawful character of articles sold by defendant, a peremptory instruction for defendant is properly refused.

Where the original vendor knowingly sells, as coal oil, a mixture of coal oil and gasoline, of such inflammable character as to be unlawful under the local statute, to a vendee who in ignorance of its unlawful nature sells it to a third party in like ignorance, the original vendor is directly responsible to the final purchaser for the consequences of an explosion, produced solely by reason of such unlawful nature while the oil is being used in a legitimate manner. In such a case the responsibility of the original vendor rests not on contract but in tort.

On the facts in this case, and in view of the ignorance of both vendees in regard thereto, the unlawful character of the articles sold *held* to be the proximate case of plaintiff's injuries; but *quære*, and undecided, whether the original vendor would have been relieved of responsibility if the first vendee had knowledge of the unlawful character of the article.

*Held*, in a case on error to the Supreme Court of the Territory of Oklahoma, that this court does not possess the power to grant a new trial solely on the ground that the jury awarded excessive damages.

When the court, at defendant's request, has charged as to the general rules of ascertaining plaintiff's damages, it is not error to add that the amount, as in this case for death of infant children, had not been fixed by the evidence, and that the verdict must be the result of the jury's own judgment.

If an ambiguity exists in the charge counsel should at the time ask the court to remove it.

18 Oklahoma, 107, affirmed.

The facts are stated in the opinion.

*Mr. John W. Shartel*, with whom *Mr. J. D. Johnson, Mr. James R. Keaton* and *Mr. Frank Wells* were on the brief, for plaintiff in error:

The plaintiff's case is not made by showing the negligent admixture and his purchase of a portion of that mixture. He also takes the burden of proving it to have been the efficient cause of the fire; that the accident would not have happened if the oil had not had the gasoline in it; and that the accident is the result of its super-inflammability. *Haff* v. *Minneapolis & St. Louis Ry. Co.*, 14 Fed. Rep. 558; *Willoughby* v. *Chicago & N. W. Railway*, 37 Iowa, 432; *Kelsey* v. *Jewett*, 28 Hun, 51; *Central R. R.* v. *Freeman*, 75 Georgia, 331; *Harrizan* v. *Chicago & I. R. Co.*, 53 Ill. App. 344; *A., T. & S. F. R. R. Co.* v. *Aderhold*, 49 Pac. Rep. 83; *Mobile & O. R. Co.* v. *Wilson*, 76 Fed. Rep. 127; *Mo. Pac. Ry. Co.* v. *Porter*, 73 Texas, 307; *S. C.*, 11 S. W. Rep. 324; *T. & N. O. Ry. Co.* v. *Crowder*, 63 Texas, 505; *C. & O. Ry. Co.* v. *Sparrow's Admr.*, 98 Virginia, 630, 641; *S. C.*, 37 S. E. Rep. 302; *N. & W. R. R. Co.* v. *Cromer's Admr.*, 99 Virginia, 763; *S. C.*, 40 S. E. Rep. 54; *Southern R. R.*,

*Co.* v. *Hall's Admr.*, 102 Virginia, 135; *S. C.*, 45 S. E. Rep. 867; *N. & W. Ry. Co.* v. *Poole's Admr.*, 40 S. E. Rep. 627; *Yaggle* v. *Allen*, 48 N. Y. Supp. 827; *Grant* v. *Railroad Co.*, 31 N. E. Rep. 220; *Pueblo Light Co.* v. *McGinley*, 38 Pac. Rep. 425; *McBroom* v. *Putney*, 28 Indiana, 353; *Connor* v. *Pacific Ry.*, 81 S. W. Rep. 149; *Loop* v. *Litchfield*, 42 N. Y. 351; *Losee* v. *Clute*, 51 N. Y. 494; *Davidson* v. *Nichols*, 93 Massachusetts, 514; *Goodlander Mill Co.* v. *Standard Oil Co.*, 63 Fed. Rep. 400; *Cleveland &c. Rd.* v. *Ballantyne*, 84 Fed. Rep. 937; *Standard Oil Co.* v. *Murray*, 119 Fed. Rep. 575.

Section 2, Ch. 21, Session Laws of 1899 (Oklahoma), is void, in that it is utterly unintelligible when it is borne in mind that the Baume scale for liquids lighter than water is an inverse scale so that a reading of forty degrees denotes a heavier oil than a reading of forty-six degrees.

The gravity test cannot be upheld as a police regulation, because if the statute is read downward on the Baume scale, it would exclude the Pennsylvania oils; and if this statute is read upward it would have the effect to exclude everything from the market of Oklahoma except Pennsylvania oils. This testimony is uncontradicted, and the law is void. *Priewe* v. *Wisconsin State Land Co.*, 67 N. W. Rep. 918; *State* v. *Santel* (Iowa), 82 N. W. Rep. 445; *Matter of Jacobs*, 98 N. Y. 98; *State* v. *Smith*, 58 Minnesota, 35; *State* v. *Julow*, 129 Missouri, 163; *Janesville* v. *Carpenter*, 77 Wisconsin, 288; *St. Louis* v. *Door* (Mo.), 41 S. W. Rep. 1094; *Mugler* v. *Kansas*, 123 U. S. 623–667; *Corrigan* v. *Gage*, 68 Missouri, 541; *Haines* v. *Cape May*, 50 N. J. L. 55; *Kimmish* v. *Ball*, 129 U. S. 466; *Scholenberg* v. *Pennsylvania*, 171 U. S. 1; *Smyth* v. *Ames*, 169 U. S. 466; *Reagan* v. *Farmers' L. & T. Co.*, 154 U. S. 362; *Railroad Co.* v. *Gill*, 156 U. S. 649; *People* v. *Marx*, 2 N. E. Rep. 29; *S. C.*, 99 N. Y. 377.

The court will take judicial notice of the facts which conclusively show that the gravity test of the act in question is not a valid police regulation. Sutherland on Stat. Constr., §§ 301–306.

Instructions 5, 6 and 7 were clearly erroneous and should not have been given.

The plaintiff had no right to go to the jury on the question as to the usual and ordinary purposes for which coal oil is ordinarily used, nor to have submitted to the jury a supposed custom, because those are matters of pleading and evidence, and the evidence is entirely silent on the subject, as well as being unsupported by any allegation in the petition. *Mobile Fruit Co.* v. *Judy*, 91 Ill. App. 82; *Lindley* v. *Bank*, 76 Illinois, 629; *Hayden* v. *Grillo*, 42 Mo. App. 1; *Gans* v. *Palo Pinto Co.*, 71 Texas, 99; *S. C.*, 8 S. W. Rep. 634; *Hendricks* v. *Middlebrooks*, 44 S. E. Rep. 835.

If the custom had arisen into the dignity of a law of the land, it was the court's duty to have so instructed the jury as a matter of law, and not leave the subject to them to deal with. *Buyck* v. *Schwing*, 100 Alabama, 355; *S. C.*, 14 So. Rep. 48; *Robertson* v. *Wilder*, 69 Georgia, 340; *Wilson* v. *Bannan*, 80 Illinois, 493; *Careby* v. *Frick*, 8 Maryland, 163.

Custom or usage must be proved. The jury's knowledge of it cannot be availed of. *Senluc* v. *Pritchard*, 4 Louisiana, 160; *Tryson* v. *Laidlaw*, 18 Louisiana, 380.

It was not a custom dignified with a force the equivalent of a law of the land. It required pleading and proof, and could not be submitted to the jury in the absence of appropriate allegations supported by proof. *Packard* v. *Van Scoic*, 58 Illinois, 79; *Randall* v. *Koehler*, 60 Maryland, 37; *S. C.*, 11 Am. Rep. 169; *Murray* v. *Hatch*, 6 Massachusetts, 465; *Livingston* v. *Maryland*, 7 Cranch, 506.

It was error on the part of the court to tell the jury that the question of damages could not be fixed by the evidence but must be the result of their own judgment.

The verdict of the jury for $14,500 for wrongfully causing the death of the four-year-old child and two-year-old child would denote an equivalent of $7,250 for each child, which is far out of range of what any court has sustained, as appears in the following cases. *Vicksburg* v. *McLean* (Miss.), 6 So. Rep.

774; *Wells* v. *Railroad Co.*, 78 N. Y. Supp. 999; *Fleming* v. *Loebel* (N. J.), 59 Atl. Rep. 27; *Little Rock Ry.* v. *Barker*, 33 Arkansas, 350; *Myers* v. *San Francisco*, 42 California, 214; *North Chicago R. R.* v. *Wixon*, 51 Ill. App. 307; *Parsons* v. *Mo. Pac. Ry.*, 6 S. W. Rep. 464; *S. C.*, 94 Missouri, 286; *Riley* v. *Salt Lake R. Co.*, 37 Pac. Rep. 681; *S. C.*, 10 Utah, 428; *Hively* v. *Webster Co.*, 91 N. W. Rep. 1041; *S. C.*, 117 Iowa, 672; *Rowe* v. *Telephone Co.* (N. J.), 48 Atl. Rep. 523; *Connaughton* v. *Sun Printing Co.*, 76 N. Y. Supp. 755; *Graham* v. *Traction Co.*, 44 Atl. Rep. 964; *Louisville & Nashville Ry. Co.* v. *Creighton* (Ky.), 50 S. W. Rep. 227; *West Chicago St. Ry. Co.* v. *Nabie*, 77 Ill. App. 176; *Fox* v. *St. Ry. Co.*, 118 California, 55; *S. C.*, 50 Pac. Rep. 25; *Con. Trac. Co.* v. *Graham*, 40 Atl. Rep. 773; *McDonald* v. *Steel Co.* (Mich.), 103 N. W. Rep. 829.

*Mr. A. H. Huston* and *Mr. John Devereux* for defendant in error:

The negligence complained of need not be the only cause, or the most proximate cause, and negligence to be the proximate cause of an injury must be such that a person of ordinary caution and prudence would have foreseen that some injury would likely result therefrom, not that the specific injury would result. The question of proximate cause, whenever there is any doubt, must always be submitted to the jury. Bishop on Rights and Torts, §§ 450–455; *Baltimore R. R. Co.* v. *Kemp*, 61 Maryland, 74; *Terre Haute R. R. Co.* v. *Buck*, 96 Indiana, 346; *Scott* v. *Hunter*, 46 Pa. St. 192; *Milwaukee R. R. Co.* v. *Kellog*, 94 U. S. 469, 474; *Kansas City* v. *Gilbert*, 65 Kansas, 469; *A., T. & S. F. R. R. Co.* v. *Parry*, 67 Kansas, 515; *Hays* v. *Mich. Cent. R. R. Co.*, 111 U. S. 228.

Where there is no intervening efficient cause the original wrong must be considered as reaching to the effect and proximate to it. *Hays* v. *Williams*, 17 Colorado, 465; *The G. R. Booth*, 171 U. S. 450; *The Ontario*, 37 Fed. Rep. 220; *Railroad Co.* v. *Elliott*, 55 Fed. Rep. 949.

The rule that where there were no eyewitnesses to the origin

of the explosion and fire, such origin must rest wholly in con-
jecture, and the case must fail for want of proof, does not apply
where there is room for balancing the probabilities and draw-
ing reasonable inferences which do account for the injury.
*Schoepper* v. *Chemical Co.*, 113 Michigan, 582; *Gas Co.* v. *Carter*,
65 Kansas, 565; *Seybolt* v. *Railroad Co.*, 95 N. Y. 562; *Lutton* v.
*Vernon*, 62 Connecticut, 1; *McBride* v. *Railroad Co.*, 19 Oregon,
64; *Railroad Co.* v. *Freeman*, 48 U. S. App. 757; *Toledo &c. Co.*
v. *Chisholm*, 83 Fed. Rep. 652; *Stowell* v. *Standard Oil Co.*, 102
N. W. Rep. 227.

The determination of the question as to whether the injury
resulted from a mere accident wherein no one was at fault, or
was caused by the negligence of the party injured or whether
it is attributable to the dangerous mixture, is a matter for the
jury. *Pittman* v. *City of El Reno*, 2 Oklahoma, 414; *Ruch* v.
*Gas Electric Co.*, 65 N. J. L. 399; *N. Y. &c. R. R. Co.* v. *New
Jersey*, 60 N. J. L. 52; *Railroad Co.* v. *Middleton*, 57 N. J. L.
154; *Malnken* v. *Freeholder*, 41 Atl. Rep. 921; *Schoepper* v.
*Chemical Co.*, 113 Michigan, 582; *Toledo R. R. Co.* v. *Chisholm*,
83 Fed. Rep. 1652; *Texas C. R. R. Co.* v. *Gentry*, 163 U. S. 353;
*Burns* v. *Chicago &c. R. R. Co.*, 69 Iowa, 450.

It cannot be said as a proposition of law that the use of coal
oil to kindle fires is contributory negligence. *Ives* v. *Weldon*,
114 Iowa, 476; *Riggs* v. *Standard Oil Co.*, 130 Fed. Rep. 199,
204; *Ellis* v. *Republic Oil Co.*, 133 Iowa, 11.

A person placing on the market for general use a dangerous
explosive which he represents and sells as a safe illuminant, is
liable for any damages caused by such substance either in the
hands of his immediate vendee or a remote purchaser. The
rule that a seller of an article of commerce not in itself danger-
ous, is not responsible for consequences to the purchaser of his
vendee resulting from defects in the articles sold, does not apply
in this case. *Elkins, Bly & Co.* v. *McKean*, 79 Pa. St. 493;
*Judson* v. *Giant Powder Co.*, 107 California, 549; *Wellington* v.
*Oil Co.*, 104 Massachusetts, 64; *Rose* v. *Stevens &c. Co.*, 11 Fed.
Rep. 438; *Stowell* v. *Standard Oil Co.*, 102 N. W. Rep. 227;

*Clement* v. *Crosby*, 111 N. W. Rep. 745; *Thomas* v. *Winchester*, 2 Seld. 397.

The burden of proving contributory negligence rests on the defendant, and it will not save the defendant, unless it has been established by a preponderance of the evidence. *Railroad Co.* v. *Horst*, 93 U. S. 291; *Hough* v. *Railroad Co.*, 100 U. S. 213; *Railroad Co.* v. *Gladman*, 15 Wall. 401; *Railroad Co.* v. *Harmon*, 147 U. S. 571; *Railroad Co.* v. *Phillbert*, 25 Kansas, 583; *Railroad Co.* v. *McCally*, 41 Kansas, 639.

The inspection law of Oklahoma is a valid act and must be interpreted so as to give effect to its *intent*.

The clear intent of the legislature was to exclude the lighter and more dangerous illuminants, and to admit the heavier and safer ones, and the obscurity in the meaning of the act which the plaintiff contends for in his brief, arises from confusing actual specific gravity, with the inverse scale of the Baume hydrometer.

This was a rightful subject of legislation and the legislature had full authority to enact it as a police regulation, for the protection of the people. *Patterson* v. *Kentucky*, 97 U. S. 501; *Shellabarger* v. *Commissioners*, 50 Kansas, 141; 1 Kent's Com. 461; *Henderson* v. *Robinson*, 76 Iowa, 603; *State* v. *Hope*, 100 Missouri, 347; *Bush* v. *Indianapolis*, 120 Indiana, 476; *Bingham* v. *Burmingham*, 103 Missouri, 345.

The court's instructions on the question of damages were correct, and the amount of damages given by the verdict was not excessive. *Railroad Co.* v. *Spence*, 23 S. W. Rep. 211; *Railroad Co.* v. *Barron*, 5 Wall. 90; *Gas Co.* v. *Carter*, 65 Kansas, 569; *Ihl* v. *Forty-second St. Ry. Co.*, 47 N. Y. 317; *Morris* v. *Railroad Co.*, 71 N. Y. Supp. 321; *Austin Rapid Transit Co.* v. *Cullen*, 29 S. W. Rep. 256.

Mr. Justice White delivered the opinion of the court.

Deselms sued the Waters-Pierce Oil Company to recover damages for the death of his wife and two young children, resulting from an alleged explosion of a highly inflammable and

explosive substance, consisting of a mixture of coal oil and
gasoline. The mixture, it was alleged, had been bought by
Deselms as coal oil from dealers who supposed it to be such,
although their vendor, the oil company, knew the dangerous
character of the article and yet had sold it as coal oil. The oil
company answered by a general denial, and specially pleaded
that if the accident in fact occurred it was caused by the negli-
gence of Mrs. Deselms. Before trial Deselms dismissed the
claim based upon the death of his wife. There was judgment
on a verdict against the oil company for $14,500, which was
affirmed by the Supreme Court of the Territory. 18 Oklahoma,
107.

On this writ the errors assigned, speaking in a general sense,
complain of the action of the court below in affirming the trial
court in giving, over exceptions of the oil company, certain in-
structions asked by Deselms, and in refusing to give various
instructions asked by the oil company. For the purpose of
clearness, however, we arrange the assignments under three
headings: first, errors relating to the action of the trial court in
giving and in refusing certain instructions; second, error in re-
fusing at the close of all the evidence a request of the oil com-
pany for a peremptory instruction in its favor, on the ground
that the proof as to negligence was not sufficient to justify sub-
mitting the case to the jury, and because, even if there was such
proof, on the facts shown there was no legal right to recover;
third, error in refusing a request concerning the method to be
applied in fixing damages in the event the jury found for the
plaintiff.

To dispose of these assignments it is necessary to take into
view the law of the Territory relating to the inspection of coal
oil, gasoline, etc., and the facts which the evidence tended to
establish. Before coming, therefore, to directly consider the
errors relied on we refer to these subjects.

In 1895 there was enacted in the Territory of Oklahoma a
statute for the inspection "of coal oil, gasoline, or any other
product of petroleum used as illuminating or burning fluids, by

whatever name known." The statute specially provided, however, that when once duly inspected in the Territory the fluids subject to inspection might be shipped to any portion of the Territory without additional inspection. See Laws, 1895, § 1, p. 174.

This act was amended in 1899. Session Laws, 1899, p. 186. Section 2 of the act amended § 8 of the prior act to read as follows:

"All illuminating fluids that flash under the conditions as prescribed in section one at a less temperature than 120 degrees Fahrenheit, and have not a specific gravity of not less than 46 degrees Baume, that is, all oils which fail to stand both tests, shall be branded by the inspector 'Rejected,' and all such oils that do not flash at a less temperature than 120 degrees Fahrenheit, and which have a specific gravity of not less than 46 degrees Baume, as determined above, shall be branded 'Approved Standard Oil.' "

By § 3 the flash test was not to be applied to gasoline or other inflammable fluids, but they were to be tested "to determine the weight or specific gravity in the same manner as required by § 1 of this act to oils." It was further provided in the section that "All gasoline to be used in vapor stoves and gasoline lamps shall have a specific gravity of not less than 70 degrees Baume, and (at) a temperature of 60 degrees Fahrenheit." It was made the duty of the inspector to brand all packages, boxes or barrels of gasoline or other fluid having no fire test with the words "Highly Inflammable," and the specific gravity found by him. Where the gasoline was found to have a specific gravity of not less than 70 degrees Baume, at a temperature of 60 degrees Fahrenheit, the inspector was required to mark the same "Approved Standard Gasoline." By § 4 the sale by any person of oil or gasoline as approved standard oil or approved standard gasoline, when in fact the same was not of that grade, as found by the inspector of oils, was declared to be a misdemeanor punishable by fine and imprisonment. Any company or corporation furnishing oils or gasoline for sale in the Terri-

tory of lower grades than that specified in the act was more-
over made amenable to a fine.

The oil company had a wholesale depot at Guthrie, Okla-
homa, for the sale of oil, gasoline, etc.  At this depot there was
a storage tank for coal oil, which in January, 1903, contained
about 6,600 gallons of that fluid, which presumably had been
inspected and tested according to law.  Into this tank an em-
ployé of the company by mistake ran about 300 gallons of
gasoline.  When the mistake was discovered the agent of the
oil company at Guthrie wrote to the manager at Dennison,
Texas, informing him of the mistake.  The manager replied,
saying, "I cannot believe that this amount of gasoline will
materially affect the burning quality of the P. W. Oil.  At any
rate, we will have to watch the matter, and take chances on
selling all the P. W. Oil in P. W. Oil storage tank, trusting that
the same will give good results."  On receipt of these instruc-
tions the agent at Guthrie, without any renewed inspection of
the oil in the tank containing the mixture of gasoline and coal
oil, sold the same to merchants in his territory as coal oil.  On
January 28, 1903, three barrels of the mixture were so sold to
Powers & Deselms, retail grocers at Orlando, Oklahoma.  One
of the barrels was sold by the firm to another merchant, and
the two remaining barrels were taken to the store of the firm,
and their contents placed in an empty tank used for that pur-
pose.  The barrels thus sold to Powers & Deselms bore no in-
spection brand, nor were the barrels inspected after they came
into the possession of the firm.  On the invoice, however, given
to Powers & Deselms by the oil company, a charge for inspec-
tion fees was made, and Powers & Deselms had no knowledge
of the real character of the material supplied as above stated.
A few days after the sale to Powers & Deselms—on a Sunday
morning—the plaintiff, Deselms, who was a clerk for the firm,
bought one gallon of the mixture, supposing it to be coal oil,
and took the same to his home in a two-gallon can.  On the
afternoon of the same day Deselms left Orlando for a brief
absence.  His wife and two children—one a boy of four, the

other a girl of two years—were left at home. The children were bright and active and were in perfect health. It had been arranged that Mrs. Emory, a sister of Deselms, would remain at night with the family.

The dwelling was a one-story wooden structure, weather-boarded on the outside and lathed on the inside, the laths being covered with canvas, and the canvas then being papered over. The house had a frontage of twelve feet, ran lengthwise east and west about twenty-four feet, and was divided into two rooms. The east room was used as a kitchen, the cooking stove being near the east wall. The west room was the general living and sleeping room. In it was a heating stove composed of a cylindrical fire-box and a cylindrical plate or body with a door in the side. This stove stood on the east side of the room and it and the kitchen stove were connected with a brick flue in the partition wall between the two rooms.

The first use made of the gallon of oil bought by Deselms was on Tuesday evening, when Mrs. Emory filled a new lamp from the contents of the can, and then lit the lamp. Almost immediately flame shot out of the chimney. Mrs. Emory extinguished the light, trimmed the wick and lit the lamp again, and upon flame again issuing out of the chimney, thinking that the lamp was defective, she extinguished the light and made no further attempt to use the lamp. The oil can was then placed in the kitchen near the southwest corner of the room. During the evening a wood fire which had been burning in the heating stove burned out. The next morning, after lighting the kitchen fire, Mrs. Emory started to kindle a fire in the heating stove. She shook down the ashes, examined the contents of the ash pan and found that the stove was cold. She ceased her preparations to start a fire, however, on being asked to assist in dressing the children, Mrs. Deselms saying that she would make a fire in the stove later. There was no fire in the stove when Mrs. Emory left the house at about 8 o'clock on that (Wednesday) morning, and she was the last person to see alive Mrs. Deselms and the two children.

We take from the opinion of the Supreme Court of Oklahoma
a summary of the evidence relative to the subsequent destruc-
tion of the house by fire and the death of the wife and her two
children:

"The plaintiff's house was discovered to be on fire at about
ten o'clock in the forenoon, and upon the arrival of the first
person on the scene it was so completely ablaze that it was im-
possible, on account of smoke and gases, to force an entrance
into the building. About nine o'clock in the morning it had
blown up cold from the northwest, and there was a high wind
blowing from that direction at the time the fire occurred.
Mr. Bradshaw was the first person to arrive at the building, and
he broke in the back or kitchen door and tried to get into the
other room, but was choked down by the dense smoke and gas,
and came out. He tried a second time to enter the house, and
was again choked and smothered by the smoke and gas, and
had to retreat. He then ran around the house and tried to get
in otherwise. About this time others came, and they broke in
the north wall and found the plaintiff's son lying face down-
ward on the bed near the northwest corner of the house, badly
burned and life extinct, probably from suffocation. As the
smoke cleared somewhat from the room they could see the body
of the plaintiff's wife lying on the floor and what remained of
the little girl on a couch. By pushing the building partly over,
the charred bodies were taken out before the fire had com-
pletely burned out.

"After the fire and after the remains of the building had
fallen in and been pushed aside and the fire partly extinguished,
the heating stove was found inclined to the northwest, the
floor being partly burned out beneath it; the top was off the
stove and the upper hinge to the door broken, the door hanging
by the lower hinge. There was paper, kindling and wood in
the stove just a little charred. The plaintiff's wife was lying
with her feet near the stove, her head away from it in a westerly
direction in front of the stove door. Near her body was found
the top or conical part of the oil can, the body of the can being

found four to seven feet away in a southwesterly direction. These were the conditions existing at the time the fire was subdued sufficiently to admit of examination by those present."

The morning after the fire about a dozen pint bottles were filled from the mixture remaining in the tank at the store of Powers & Deselms. After being corked and sealed with plaster of paris the bottles were placed on shelves in a drug store at Orlando, the shelves being located fifteen to eighteen feet from a stove standing in the middle of the room, the temperature of the room being about 75 degrees. In about twenty minutes one of the bottles exploded, and the remainder were taken into the cellar. Subsequently the fluid in two of the bottles was tested and analyzed by George L. Holter, an expert chemist, who was then and for thirteen years had been professor of chemistry and metallurgy in the Agricultural College at Stillwater, Oklahoma. Testifying as to the analysis he had made, Professor Holter said he found by the use of a closed-cup tester that the material would flash at 60, which would indicate a flashing point of not more than 80 degrees in the open-cup test required by the statute. The witness made a "fractional distillation" of the fluid to ascertain if it had any light material in it to account for the low-flash test, and produced a distillate of practically 5 per cent of the original quantity, which, judging from the general appearances, smell and flash point, the witness said, was "what we generally term naphtha or gasoline." The flash point of this distillate was 37 degrees, while the flash point of the residue of the material from which the distillate had been taken was 95 degrees, which, allowing for a full 25 degrees of difference between the closed and open cup-test methods, would bring the flash point at about 120 degrees, according to the statutory method. The witness swore that the mixture of coal oil and gasoline at the ratio of 95 and 5 per cent, would be dangerous to use as coal oil. He, moreover, testified that ordinarily an explosion of three-fourths of a gallon of a mixture of coal oil and gasoline, such as had been examined, would generate a volume of gas fifteen hundred to eighteen hundred times

that of the liquid. Further, the witness declared that while it
would not be dangerous to use coal oil having a flash test of
120 degrees to start a fire, it would be dangerous to use the
analyzed mixture for that purpose.

In the light of the foregoing we come to consider the assign-
ments of error.

1. *The error alleged to have been committed by the trial court in
giving to the jury, at the request of Deselms, four instructions,
numbered 4, 5, 6 and 7, and the refusal to give two instructions,
numbered 5 and 11, requested by the oil company.*

Instruction numbered 4 called the attention of the jury to the
character and quality of the oils and gasolines which the stat-
ute of the Territory permitted to be sold, referred to the tests
prescribed for ascertaining their quality, and pointed out that
it was a criminal offense to sell products of petroleum which did
not conform to the statutory standard. It is said that this in-
struction was based mainly upon the provisions of § 2 of the act
of 1899, heretofore quoted, which section, it is insisted, is void,
and therefore afforded no proper basis for consideration by the
jury in determining whether the oil company had been negli-
gent in putting the fluid in question upon the market. This
rests upon the contention that the text of the statute is in effect
meaningless, and that besides, even if it could be enforced ac-
cording to its letter, the statute would lead to such an absurd
result as would operate to destroy the very purposes which it
was designed to accomplish. We think the contentions are
without merit. As we have seen, the requirement of the stat-
ute as to specific gravity is that the oil shall "have not a specific
gravity of not less than 46 degrees Baume." While the two
negatives may apparently render the clause on its face confus-
ing, if the superfluous negative be omitted all difficulty on this
subject is removed, and the sentence would therefore provide
that the oil must have a specific gravity of not less than 46 de-
grees Baume. This provision obviously exacts that the gravity
of the oil shall be ascertained by the use of a Baume hydrom-
eter, and it is the method of reading the scale of that instru-

ment upon which is based the argument that, even with the superfluous negative omitted, the provision of the statute leads to an absurd result and gives sanction to the admission of dangerous while excluding safe oils.  In ascertaining the specific gravity by the Baume scale the heavier the oil tested the lower will be the number indicated on the scale, and consequently the higher the number on the scale the lighter or more volatile will be the oil tested.  This results because the Baume scale is to be inversely read.  Now as the statute, omitting the superfluous negative, reads that the oil shall have a specific gravity of not less than 46 degrees Baume, the contention is that the statute. excludes all oils lower than 46 degrees and permits all oils above 46 degrees to be sold as not dangerous.  But we think when the context of the statute is considered and its provisions as to gasoline and the other light and highly inflammable fluids are taken into view, it becomes quite clear that while the words of the statute are somewhat confusedly expressed, arising from the fact the Baume scale is inversely read, that the plain purpose of the statute was to permit the use of oils which, when tested by the Baume hydrometer, indicated at least 46 degrees specific gravity, and to exclude all oils of a lighter character, that is, all oils which, when tested by the hydrometer, indicated a degree of gravity on the scale higher than 46.  In other words, we think that when the provision of the statute is taken into view in connection with the inverse scale of the Baume hydrometer the requirement that the oil shall have a specific gravity of not less than 46 degrees Baume in effect was intended to exact that the coal oil permitted to be sold as not dangerous should be of no less gravity than 46, and therefore when tested should indicate not more than 46 degrees on the Baume scale.

Relying upon testimony which was offered tending to show that from some localities oils which are perfectly safe are obtained, although they have a specific gravity somewhat above 46 Baume, it is insisted that the law in question was not a legitimate exercise of the police power, since by selecting 46 degrees Baume as the standard, oils are excluded which would

be as safe for use as oil complying with the standard fixed by the statute. But we think the court below was clearly right in deciding that, as the subject was within the police power of the State, it was not within the province of the judiciary to disregard the statute and treat it as void upon the theory that the legislature had acted unwisely in fixing the standard which the statute prescribed.

It is further contended that § 4 of the act of 1899 was void because of the alleged unequal punishment therein provided for persons and corporations performing the same act. But whether or not the section is subject to the criticism made against it, it is clearly separable from the rest of the act, as held by the court below, and in no wise affected the unlawful use within the Territory of oil which did not conform to the standard fixed by the statute.

The other instructions, Nos. 5, 6 and 7, which the assignment of errors assail, in various forms of statement submitted to the jury the following subjects: *a*, The liability of the oil company predicated upon the fact that the mixture in question was dangerous to be used for the usual and ordinary purposes for which coal oil is generally used; *b*, that it was knowingly sold by the oil company to be resold as coal oil; *c*, that the making use of coal oil to kindle or start fires was a general and universal custom or usage, and hence the oil company had reason to believe that the mixture so sold by it would be used for such a purpose; and, *d*, that the accident happened while the fluid was being used with ordinary care and caution, in the belief that it was coal oil, and for a purpose for which coal oil is usually intended and used.

In this connection it is to be observed that at the trial Deselms, the plaintiff, offered evidence tending to show that there was a general custom to make use of coal oil for kindling fires, but on the objection of the oil company the offered testimony was excluded, the court declaring it was of opinion that whether coal oil was generally used for the purpose claimed the subject was one of common knowledge and experience in the com-

munity, and it was not necessary to offer proof in relation
thereto, and, as shown by the instructions complained of, the
determination of the existence of the custom or usage was sub-
sequently left to the jury.  In affirming the action of the trial
court on this branch of the case the Supreme Court of the Terri-
tory held that the trial court had not erred in excluding the
testimony as to the custom or usage in question, and that no
prejudicial error had been occasioned by submitting the de-
termination of the question to the jury, since the custom in the
community was so universal that the court would have been
authorized to have instructed the jury accordingly.  In judi-
cially noticing the existence of a usage or custom among per-
sons generally within the Territory to use coal oil in kindling
fires, we cannot say the court below erred, and, upon the hy-
pothesis indulged, no error was committed in overruling the
exceptions to the instructions.  See *Ellis* v. *Republic Oil Co.,*
133 Iowa, 11.

We deem it unnecessary to particularly refer to the assign-
ments of error relating to the refusal of the trial court to give
to the jury certain instructions submitted on the part of the
oil company, as the proposed instructions but embodied the
converse of the propositions contained in instructions Nos. 5, 6
and 7, just disposed of.  One of the instructions, however, was
framed upon the theory that the case was controlled by the act
of 1895, providing for the inspection of oils, etc., because of the
alleged void character of the act of 1899, a contention which
we have also previously adversely disposed of in considering
that subject.

2. *The error alleged to have been committed by the appellate
court in holding that the trial court rightly refused at the close of
the evidence to give a peremptory instruction to the oil com-
pany.*

The errors assigned on this subject, as we have seen, are
twofold, that is, the inadequacy of the facts to show that the
accident was caused by the inflammable nature of the mixture
and the absence of a legal right to recover, even if the proof

justified submitting the question of fact to the jury. Concerning the first, the contention is that as the plaintiff was bound to make out his case by a preponderance of evidence, and as there were no facts in evidence from which an inference could properly be drawn that the accident might not have resulted if there had been no admixture of gasoline with the coal oil, or which authorized the inference that the loss was not caused solely by the negligence of the wife of the plaintiff, the peremptory instruction should have been given.

It is, of course, to be conceded that the burden of proof was primarily upon the plaintiff to establish the negligence charged, and it was not enough to show an accident and an injury. *Patton* v. *Texas &c. Ry. Co.*, 179 U. S. 658. We are, however, of the opinion that the court below was clearly right in deciding that the trial court had committed no error in ruling that the evidence was sufficient to require the submission of the case to the jury on the question of the cause of the accident. The highly inflammable character of the mixture was well illustrated by the testimony of Mrs. Emory, a sister of the plaintiff, that on filling a new lamp with the mixture and lighting it flame shot out of the lamp chimney. Undoubtedly the evidence directly pointed to the fact that the can which contained the fluid had been taken from the east room, where it usually was kept, to the room in which stood the heating stove. Clearly, also, the proof as to the unburned and charred or stained condition of the kindling wood in the heating stove, when connected with the removal of the can, tended to show that some of the fluid from the can had been applied to the kindling before it was ignited and preparatory to starting a fire. But the situation of the can after the fire and the place where the top of the can was found, clearly tended to rebut the implication that the fire had been lighted and fluid from the can then poured upon it. In view of the finding of the jury, as to the custom to use coal oil for kindling fires, and the knowledge which the oil company must be presumed to have had, that the fluid sold by it as coal oil would be used for this purpose, the mere inference

that the oil from the can had been applied to the kindling before it was lighted afforded no ground for taking the case from the jury. · Moreover, in view of the proof as to the condition of the kindling wood, of the situation of the can, of the condition of the stove after the fire, of the position of the bodies of the wife and the two children, and of the dense and large volume of gases which filled the premises at the outbreak of the fire, we think there was adequate proof from which the jury could have inferred that the accident was the result of an explosion caused by applying a light to the kindling wood in the stove after it had been saturated with fluid taken from the can, an accident therefore resulting solely from the wrong of the oil company in selling as coal oil a highly dangerous and inflammable mixture, unsafe to be used for the purpose for which, under the instruction of the court and the findings of the jury, coal oil was ordinarily used. It is unnecessary to further elaborate the subject because of the very full and accurate review of the tendencies of the proof in relation to the matter made by the court below in its opinion.

The contention that, although there was sufficient evidence to go to the jury as to the fact of negligence on the part of the oil company, nevertheless there was nothing in the tendencies of the proof to support the conclusion that the oil company was legally responsible for the accident rests on the proposition that as Deselms bought the oil, not from the oil company, but from the firm of Powers & Deselms, and therefore was only a remote vendee, there was no legal liability on the part of the oil company. This is based upon the propositions that there was between the plaintiff Deselms and the oil company, no contractual relation, and besides in any event the act of the oil company in selling the dangerous mixture to Powers & Deselms was not the proximate cause of the accident. As we have seen, however, there was evidence tending to prove, and under the instructions given to the jury their verdict must be taken as establishing the following facts: 1, that the oil company knowingly sold to Powers & Deselms a highly inflammable mixture of coal oil and

gasoline in violation of the territorial statute, and that the oil company knew, or had reason to assume, that the mixture so sold would be retailed by its vendees (Powers & Deselms) to the public generally for domestic use as coal oil; 2, that Powers & Deselms purchased the mixture in question supposing it to be coal oil, and that the plaintiff, Deselms, bought the mixture from the firm in like ignorance of its real character; 3, that there was a general custom in the community to use coal oil for kindling fires, a use which would not have subjected persons so using it and exercising ordinary care to the appalling danger which would arise from the making use of the inflammable and dangerous mixture composed of gasoline and coal oil, a custom of which the oil company had knowledge or of the existence of which it is presumably charged with knowing. From these facts it is apparent that the responsibility of the oil company rested not on contract but in tort, and therefore the contention as to want of contractual relation is wholly irrelevant.

In *Savings Bank* v. *Ward,* 100 U. S. 195, relied upon by the oil company, it is true an attorney at law was held not to be liable to a third party for the negligent performance of a contract to examine the title to certain real estate, because of the absence of a contractual relation. But the distinction between the principle which was there controlling and the one which is here applicable was pointed out in the opinion of the court in that case, where it was said (p. 204):

"Pharmacists or apothecaries who compound or sell medicines, if they carelessly label a poison as a harmless medicine, and send it so labelled into the market, are liable to all persons who, without fault on their part, are injured by using it as such medicine, in consequence of the false label; the rule being that the liability in such a case arises, not out of any contract or direct privity between the wrongdoer and the person injured, but out of the duty which the law imposes on him to avoid acts in their nature dangerous to the lives of others. He is liable, therefore, though the poisonous drug with the label may have passed through many intermediate sales before it reached the

hands of the person injured. *Thomas* v. *Winchester*, 2 Seld. 397, 410."

And the same principle was applied to a sale of dangerous oil in *Wellington* v. *Downer Kerosene Oil Co.*, 104 Massachusetts, 64, where it was said: "It is well settled that a man who delivers an article, which he knows to be dangerous or noxious, to another person, without notice of its nature and qualities, is liable for an injury which may reasonably be contemplated as likely to result, and which does in fact result, therefrom, to that person or any other, who is not himself in fault." And the like doctrine has been expounded in many cases. See, especially, *Elkins* v. *McKean*, 79 Pa. St. 493, and *Weiser* v. *Holzman*, 33 Washington, 87, where the doctrine is clearly and forcibly stated and the many authorities sustaining the same are cited. In view of the tendencies of the proof as to the entire absence of knowledge by Powers & Deselms, when purchasing from the oil company, and the ignorance of Deselms when he bought from the firm, of the character of the fluid, it is certain that in the case before us the act of the oil company, in any view, was the proximate cause of the accident, as no other independent and efficient cause or wrong can be legally said to have occasioned the same. *The G. R. Booth*, 171 U. S. 450.

But because we confine ourselves to the particular facts of the case before us we must not be understood as holding, in view of the dangerous character of the fluid and the putting of the same upon the market by the oil company, with the expectation that it would be retailed to the public, and the violation of the statutory regulations and prohibition concerning the sale of such article, that under the general principles of law sustained by the authorities already cited, a recovery against the oil company might not have been justified, even if the proof had established that Powers & Deselms had been informed by the oil company of the dangerous character of the mixture. See, further, *Clement* v. *Crosby*, 148 Michigan, 293, and *Stowell* v. *Standard Oil Co.*, 139 Michigan, 18, and authorities cited in both cases.

*3. It remains only to consider error alleged to have resulted
from the affirmance of the refusal of the trial court to give a par-
ticular instruction asked by the oil company concerning the sub-
ject of damages.*

In its general charge the court in substance instructed the
jury that the measure of damages was the net value to the
father of the services of his children during their minority.
Thus the court said:

"Damages are intended to be compensatory and must be
fair, reasonable and just. The father is entitled to the services
of his son until he arrives at the age of twenty-one years, and
of the daughter until she arrives at the age of eighteen; he is
also charged with the expense of their support, maintenance,
education and social training, and you must fix the amount
which, in your judgment, will compensate him for any pecu-
niary loss he may have sustained."

And, later, the jury were cautioned that their verdict "must
be based upon the evidence which the court has permitted to
go to you."

On behalf of the oil company the trial judge was asked to
give an instruction numbered 14, as follows:

"In determining the amount of your verdict for the plain-.
tiff, if you find for such plaintiff, you should not take into
consideration the pain suffered by the deceased or the wounded
feelings of the father or other surviving relatives, but your
verdict must be limited to such amount, if any, as you believe
the plaintiff has suffered financially by reason of the death of
his children. In other words, the recovery, if any, is to be a
pecuniary compensation for a pecuniary loss, and such finding
of loss must be based upon the evidence introduced in the case."

The court gave this instruction, with the addition at the end
thereof of the following sentence: "The amount of damages
cannot be fixed by the evidence, but must be the result of
your own judgments."

We shall consider the exception in the light of the objections
urged in the brief of counsel. In discussing the subject of ex-

cessive damages counsel for the oil company thus treat of the modification of instruction No. 14:

"We submit, in the first instance, that it was error on the part of the court to tell the jury that the question of damages cannot be fixed by the evidence, but must be the result of your own judgment. While it is true that the amount of damages cannot be named or ascertained from specific evidence disclosing the amount of loss on the part of plaintiff, yet they must bear a relation to the evidence, and the vice of this instruction is that it cuts loose the minds of the jury from all regard to the evidence, and it is needless to say that they went the instant they were turned loose. The authorities cited later will fully cover this point in this instruction."

The authorities referred to are decisions of state courts of last resort dealing with the subject of excessive damages when allowed by juries for the negligent causing of the deaths of minors. They more particularly concern the duty of a court to grant or refuse a new trial where the damages are excessive, and where the action of the trial court in refusing a new trial was open to review in the appellate court. As it is clear that this court does not possess such a power (*City of Lincoln* v. *Power*, 151 U. S. 436; *Ward* v. *Joslin*, 186 U. S. 142, 153), we need not further notice the authorities relied upon.

That the correctness of the general instruction as to what were the elements of damage sustained by the father was not assailed by the oil company sufficiently appears from the argument of counsel above excerpted, which also evidences the fact that no question was intended to be made as to the non-production at the trial of witnesses to give evidence in respect to the net value of the prospective services of the children. Manifestly, the rule deemed by the court and counsel to be applicable, to quote language contained in the opinion in *Brunswig* v. *White*, 70 Texas, 504, was that "when from the age or undeveloped state of the child any estimate of value of the services until majority would be matter of opinion, in which no particular or especial knowledge in way of expert testi-

mony could be procured better than the judgment and common sense of the ordinary juror called to the duty of determining such value—then, upon such testimony, the sound discretion of the jury can be relied on to determine the value, without any witness naming a sum." And see *Balto. & Ohio S. W. Ry. Co.* v. *Then*, 159 Illinois, 535, and *Birkett* v. *Knickerbocker Ice Co.*, 110 N. Y. 504.

The complaint that error was committed in the modification made of requested instruction No. 14, as stated by counsel, amounts therefore but to the assertion that thereby the jury were informed that they possessed power to capriciously fix the amount of damages. We are unable, however, to so interpret the language, especially when read in connection with the prior instructions of the court. The jury were not told that the "question" of damages could not be fixed by the evidence, but that the "amount" thereof had not been fixed. When they were further instructed that the amount of damages must be "the result of your own judgments," we think, in reason, the jury could only have understood that it was left to their sound sense and deliberate judgment to determine the amount of damage, from a consideration of the various elements entering into the damage, and the factors in evidence, viz., the age, health, condition in life of the children, etc. If counsel were of opinion that the modification as expressed was susceptible of being misunderstood by the jury, the court should have been asked to remove the supposed ambiguity.

Finding none of the assignments of error relied upon and which we have power to review to be well founded, it results that the judgment of the Supreme Court of the Territory of Oklahoma must be and it is

*Affirmed.*