GORDY v. PAN AMERICAN PETROLEUM CORPORATION et al.

(Division B. Jan. 22, 1940. Suggestion of Error Overruled March 4, 1940.)

[193 So. 29. No. 33946.]

314

Clements & Clements, of Rolling Fork, and **V. B. Mont-gomery**, of Belzoni, for appellant.

316

**Butler & Snow**, and **Wells, Wells & Lipscomb**, of Jackson, for appellee, Pan American Petroleum Corporation.

318

320

**Murphy & Wadlington,** of Belzoni, for appellee, P. L. Domengeaux.

McGehee, J., delivered the opinion of the court.

This suit is for the recovery of damages for personal injuries sustained by the appellant on account of an explosion of a can of petroleum products in the nature of gasoline or tractor fuel, which had been sold to her husband as kerosene by an agent or servant of the appellee, P. L. Domengeaux, the operator of a bulk station for the sale and distribution of such products, and which had been purchased by him from the appellee, Pan American Petroleum Corporation; and in which suit there was a peremptory instruction granted in favor of the appellees.

The first count of the declaration sought to predicate liability against the petroleum corporation as well as the bulk station operator upon the alleged relationship of master and servant. The proof disclosed that the bulk station site, building, storage tanks, and other equipments were leased by the appellee, Domengeaux, from the appellee, Pan American Petroleum Corporation, but that Domengeaux purchased the petroleum products handled at said station for sale, and paid for them by taking advantage of the cash discounts allowed for payment within ten days from receipt of invoices, and then sold the same as his own, making the deliveries to his customers in his own tank trucks, at retail for cash or on credit, as he saw fit; and his helpers at the bulk station plant, as well as his truck drivers and other

employees, were employed by him, without any right reserved unto the appellee, Pan American Petroleum Corporation, in the distribution sales contract or otherwise, to exercise any supervision or control over their physical conduct or services in such manner as would constitute the relation of master and servant, under the principles announced in the previous decisions of this Court. Texas Co. v. Mills, 171 Miss. 231, 156 So. 866; Texas Co. v. Jackson, 174 Miss. 737, 165 So. 546; Louisiana Oil Corp. v. Renno, 173 Miss. 609, 157 So. 705, 98 A. L. R. 1296; Cook v. Wright, 177 Miss. 644, 171 So. 686, and Texas Co. v. Wheeless (Miss.), 187 So. 880, and cases therein cited.

The second count of the declaration alleged that the appellee, Domengeaux, was charged under the law, when dealing with volatile, dangerous and explosive substances, not to sell the same to an innocent and unsuspecting purchaser as kerosene for use for domestic purposes; that the dangerous and explosive substance in the nature of gasoline or tractor fuel, which was sold by him to the husband of the appellant, for illuminating purposes and other domestic uses, had been theretofore purchased by said Domengeaux from the appellee, Pan American Petroleum Corporation as kerosene; that the said petroleum corporation, as a manufacturer of highly volatile, dangerous and explosive substances, was under a duty to the public not to place the same on the market as kerosene, and that both of the appellees violated their duty in the premises. And the proof disclosed that on March 4, 1938, the appellee, Domengeaux, placed an order for a railroad tank car of kerosene with the appellee petroleum corporation; that the same was thereupon shipped and billed to him as such and was delivered at the bulk station plant on March 8, 1938, as the product of the said petroleum corporation; that thereupon one Ivey McNeal, a helper employed by the appellee, Domengeaux, at the bulk station plant, unloaded the railroad tank car, which contained 4,052 gallons, into an 8,000

gallon capacity storage tank for kerosene at such station; that alongside this storage tank there were two others, one of which was of 17,000 gallon capacity for the storage of gasoline, and the other of 8000 gallon capacity for the storage of tractor fuel; that from each of these three storage tanks there extended a hose pipe through a small house at the bulk station building and onto a platform from which truck tanks were loaded; that the hose pipe extending from the kerosene storage tank was painted green, the one from the gasoline storage tank orange, and the one from the tractor fuel tank black; that at the edge of the platform, where these hose pipes were picked up for use by the helpers, the ends thereof were located only three or four inches from each other; that the truck tanks into which the petroleum products were transferred from these storage tanks contained about six different compartments, which were used and filled interchangeably with gasoline, tractor fuel, and kerosene; that before making retail sales of kerosene the helper, McNeal, would draw out five gallons at a time into a container, which he would then empty into a 115 gallon kerosene tank, painted green, and labeled ''Kerosene'' in large white letters, located inside the bulk station building, and from which green tank he would draw out kerosene for sale at retail; that on April 5, 1938, the husband of the appellant sought to purchase five gallons of kerosene, furnishing his own can for that purpose, when a negro helper delivered the same to the purchaser by drawing it out of the said 115 gallon green kerosene tank, located in the bulk station plant building, as aforesaid, it being shown without dispute that the negro helper filled the customer's tank from the proper container; that this customer also purchased on that day from the appellee, Domengeaux, a fifty-five gallon tank of tractor fuel, and then carried both of the said filled containers to his home, located out of town, and where he stored the fifty-five gallon can of tractor fuel on his premises outside of his residence and placed the five gallon can, which he thought

was kerosene, in the corner of his kitchen; that he used more than three gallons of the contents of this five gallon can to fill his Electrolux refrigerator which he had no occasion to light prior to the accident in question, and then left the can with its remaining contents behind the kitchen door to be used by the cook in kindling wood fires in the stove and for filling a kerosene lamp used in the house; that on the night of April 12, 1938, some of this substance was placed in the kerosene lamp, and it caused the lamp to flicker and pop, and to burn dimly, but its explosive character was not then detected; that on the next morning the cook undertook to use for the first time some of the contents of this can for lighting a wood fire in the stove, and after pouring some of it on the wood and setting the can on the floor about two feet from the stove she struck a match on a piece of wood on which the stove leg rested, when there was an immediate explosion of the can which caused her clothing to catch fire and caused her to be burned to death; that thereupon the plaintiff ran into the kitchen and was severely burned on her arm and body in an effort to put out the fire on the cook's clothing caused by the explosion; and that the house was damaged by the fire while the household furniture and equipment were being removed therefrom.

After the explosion occurred, the husband of the appellant, and others, drew out samples of the petroleum product which had been placed in the Electrolux refrigerator and caused the same to be analyzed by a state chemist. The result of the analysis, as disclosed by the proof on the trial, was that the substance was found to be highly volatile, and dangerous and explosive at room temperature, or 80 degrees Fahrenheit, whereas kerosene is required, by the provisions of Sec. 4, paragraph (h), subsection (3), Chapter 163, of the Laws of 1936, to have a flash-point not lower than 115 degrees Fahrenheit. Moreover, it is further provided by Sec. 8 of said Chapter 163 of the Laws of 1936, supra, that:

"No person, whether manufacturer or distributor shall

deliver to any person or retail station any illuminating oil, unless there is delivered in the appropriate manner required in the case of gasoline deliveries, or already in the possession of said consignee, a true certificate covering the delivery stating that the illuminating oil conforms to the standards according to the instruments and methods required in this act for U. S. government specification kerosene.

"No person shall sell any illuminating oil at retail unless he shall have received at the time of its delivery and have at the time of the retail sale a certificate covering said delivery as required in the preceding paragraph.

"Any person, a resident of this state, distributing gasoline purchased from some other manufacturer or distributor may comply with the requirements thereof regarding certificates by delivering to the retailer in lieu thereof, a true copy of the certificate given him on such product, and certifying in writing signed by him as to the correctness of such copy."

The statute above referred to is an act for the regulation and inspection of the quality and methods of measurement of petroleum products, and to prevent deception with respect thereto; and contains provisions, unnecessary to here quote in detail, which forbid the sale, or exposing for sale, of gasoline and other similar products of petroleum capable of being used for illuminating, heating power, and other purposes, under any other than the true name of said products, and under any trade name or trade mark of any manufacturer or distributor other than that of the manufacturer or distributor of the petroleum products so sold, exposed, or offered for sale, and requires certificates of the person, whether manufacturer or distributor, showing that such petroleum products offered for sale in this state have been tested by instruments and distillation and other methods according to rules adopted and now in force by the bureau of mines, department of commerce, United States Government, for testing petroleum products intended for pur-

chase by the United States Government and signed by the manufacturer, distributor, or agent; and which certificates shall be true and correct in every particular, and shall show that the date when the product was tested was not more than thirty days before delivery of such product. The record before us is silent as to whether the provisions of this chapter, as well as those of Chapter 162 of the Laws of 1936, were complied with in the instant case, but we are of the opinion that if the same had been complied with, the highly volatile, dangerous and explosive nature of the substance sold to the husband of the appellant would have been detected by the manufacturer or distributor in the case at bar. The statutes hereinbefore referred to are not mere taxation statutes alone, as contended by the appellees. When their provisions are considered as a whole it is manifest that they were intended to prevent deception to the public; that the state was interested in seeing its citizens get the quality of products paid for, and that their lives and property should not be endangered by the attempted use of dangerous and explosive products purchased as harmless, as well as for the purpose of enabling the taxing authorities to collect the proper tax on each respective product; and certainly this is true with reference to the provisions hereinbefore quoted relating to the sale of such products for illuminating purposes.

The peremptory instruction was evidently granted in favor of the appellee, Pan American Petroleum Corporation, under the first count of the declaration on the theory that the relation of master and servant did not exist between the petroleum corporation and the appellee, Domengeaux, and was granted under the second count thereof for the reason that the proof disclosed that the said petroleum corporation purchased the contents of the railroad tank car from the Stanolene Gas and Oil Company of Superior, Louisiana, a reputable manufacturer, on the assumption in good faith that the same was as represented, but the principle of law placing the lia-

bility solely on the manufacturer in such cases is not applicable under some of the authorities where the intermediary places the products on the market as its own.

It is stated in the American Law Institute, Restatement of Torts, Volume 2, Sec. 400, that: "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." This rule was applied in the case of Thornhill v. Carpenter-Morton Co., 220 Mass. 593, 108 N. E. 474, to a product not intended for food, drink, or medicine, but which involved some walnut oil stain sold in cans bearing the seller's name as manufacturer, and where the product was in fact manufactured by someone else, the liability being placed against the seller on the ground that it had adopted, labeled, and sold the same as its own product, the Court holding that the jury could have found that the stain contained such an excess of benzine, or other volatile oils, as to make it a highly inflammable and dangerous fluid or substance. This case, as well as the rule announced in the American Law Institute, Restatement of Torts, hereinbefore quoted, was cited with approval by this court in the case of Swift & Co. v. Hawkins, 174 Miss. 253, 164 So. 231. However, a food product was involved. Our Court later held, however, in the case of Cone v. Virginia-Carolina Chemical Corporation, 178 Miss. 816, 174 So. 554, 555, that: "A person who buys articles not constituting food, drink or medicine, to be taken internally, cannot hold the seller liable for injury if such articles were bought from a reputable manufacturer or dealer. A distinction must be borne in mind between those substances constituting food, drink or medicine, to be taken internally, and those intended for use on external objects." In the Hawkins case the seller had adopted the product as its own, whereas this is not shown to have been done in the case last above mentioned. Moreover, a highly inflammable and dangerous substance was not involved in either case. However, our attention is called to a prior decision,

Hercules Powder Co. v. Calcote, 161 Miss. 860, 138 So. 583, 584, which involved a sale of dynamite sold under the trade name of the said Hercules Powder Company, which was the manufacturer of the dynamite and of the caps, but had purchased the defective fuse in question from another reputable manufacturer, and then sold the entire article under its own trade name. That case might be controlling here as to the sale of dangerous explosives, except for the statutes hereinbefore referred to and the fact that it is to be ovserved from the opinion herein that the Court stated that: ''The proof is undisputed that there is no way, outside of the factory of the maker, to determine upon an ocular inspection of this fuse whether it was or was not defective. Appellee who was of long experience recognized this fact, and himself made the test or experiment upon this issue; and, before beginning to use the fuse, he cut off a piece of it, and fired it, as a result of which he found it good. What more could the seller itself have done?''

In the case at bar, however, the test and inspection which was required by the statutes hereinbefore mentioned on the part of the appellee petroleum corporation, whether manufacturer or distributor, would have disclosed the fact, if it were true, that the railroad tank car of petroleum products sold and delivered by it to the appellee, Domengeaux, was a highly volatile and explosive substance, instead of kerosene. The statutes seem to make it the duty of the seller of such products in this state to know the contents of a shipment which he markets for use or resale. If the performance of this statutory duty of making the inspections and tests of the product sold in this state can be delegated to an undisclosed manufacturer residing outside of the state, and having no agents here, then may not the petroleum companies selling gasoline, tractor fuel, kerosene, etc., in this state, and which they place on the market as their own product and under their own label and trade name, likewise avoid the *penalties* imposed by these statutes for

failure to make the inspections and tests required? In the present case a representative of the appellee petroleum corporation, out of its New Orleans office, testified unequivocably that said appellee placed the product here in question on the market as its own product, and in the same manner as if it had manufactured the same.

Under the views which we have hereinbefore expressed we deem it unnecessary to discuss the cases of Pate Auto Co. v. W. J. Westbrook Elevator Co., 142 Miss. 419, 107 So. 552; Kilcrease v. Galtney Motor Co., 149 Miss. 703, 115 So. 193; and Ford Motor Co. v. Myers, 151 Miss. 73, 117 So. 362, relied upon by the appellee, petroleum corporation, wherein no duty was owed by the defendant to the plaintiff under the facts thereof, and which do not deal with highly inflammable and dangerous substances placed on the market by the seller as its own product and under a name which would indicate that it was not inherently dangerous. A case more nearly in point on the issues here involved is that of Waters-Pierce Oil Co. v. Deselms, 212 U. S. 159, 29 S. Ct. 270, 53 L. Ed. 453.

Likewise, the peremptory instruction was granted in favor of the appellee, Domengeaux, on the ground that he had purchased in good faith the products in question from a reputable dealer, the appellee petroleum corporation, as kerosene, and had delivered this identical product to his customer. The giving of this peremptory instruction, however, does not take proper account of the proof that all of the remaining contents of this railroad tank car were sold in the local territory served by the appellee, Domengeaux, as kerosene, without complaint from any other customer and with no injurious consequences resulting from the use thereof by the trade. The jury may have decided on sufficient reason, in view of the extremely dangerous and highly explosive character of the substance which exploded and caused the injuries to the appellant and the death of her cook, that the remaining contents of the train car load of more than 4000 gallons of the same product could not, either probably or

possibly, have been used for similar purposes throughout an entire month during which it was retailed in the immediate territory without the occurrence of a series of explosions and numerous accidents of a serious nature. In other words, the jury may have been amply warranted by this circumstance alone in rejecting the testimony of the witness, McNeal, wherein he claimed that, as an employee of Domengeaux, he placed in the 115-gallon kerosene tank for retail the same product which had been purchased from the appellee petroleum corporation, notwithstanding that he had previously drawn the product out of one of several compartments of a tank truck which were used interchangeably for highly volatile and explosive products, as well as kerosene. Nor did the granting of such instruction give proper weight to the evidence from which the jury might reasonably conclude that the system adopted by the appellee, Domengeaux, in transferring the product from the storage tank into the truck tank, and using the several compartments thereof interchangeably for these various products, was a negligent system under which the helper, McNeal, may have drawn the product intended for kerosene out of the wrong compartment of the tank truck through mistake or inadvertance, on account of the fact that a compartment may have contained a product other than shown by the label thereon in violation of Section 14 of Chapter 163 of the Laws of 1936.

It is true that the helper, McNeal, testified that he would always draw or drain out all of the gasoline or tractor fuel from any compartment before filling the same with kerosene, and further testified in such manner as to trace the identical product purchased from the appellee petroleum corporation as kerosene until it reached the can of the customer, but we are of the opinion that this testimony presented an issue for the jury in view of the fact that the testimony on behalf of the said appellee also showed that none of the remaining contents of the railroad tank car proved to be highly

volatile and explosive like that sold to the customer here, and from which fact the jury may have concluded that a mistake was made on the other hand by the helper at the bulk station plant while transferring the product from a storage tank into the truck tank by using the wrong hose pipe for such purpose. Of course, if the appellee petroleum corporation actually delivered to the appellee, Domengeaux, a car of kerosene suitable for illuminating purposes which could be used without dangerous consequences to the retail trade, when the customer is exercising due care for his own safety, then there could be no liability against the said petroleum corporation, since a failure to comply with the statutory requirements aforesaid would not constitute the proximate cause of the injury complained of, but on the contrary the proximate cause of the accident and injury complained of would be the negligence of the appellee, Domengeaux, in selling the product out of the wrong tank or compartment.

Under the facts disclosed by the record we are of the opinion that the proof presented an issue for the jury as to whether the accident and injury were the proximate result of the negligence of the appellee, Domengeaux, or that of the appellee petroleum corporation in selling the wrong product for kerosene, or that of both the appellees in the event the jury should believe that the appellee petroleum corporation sold and delivered to the appellee Domengeaux a volatile and explosive product in the railroad tank car in question instead of kerosene, and that the said Domengeaux could have discovered this fact by the exercise of reasonable care commensurate with the danger involved and his duty to the public in the premises, keeping in mind that the petroleum corporation could not be held liable in any event if a mistake was made by a helper at the bulk station in drawing the product from the wrong storage tank or the wrong compartment of the tank truck, or by mixing the product under the system of operation.

For the reasons hereinbefore stated, we think that the cause should be reversed and remanded for a new trial. Reversed and remanded.