# Richmond.

The American Oil Company, a Corporation, and Capitol Oil Company, Incorporated, v. William W. Nicholas.

March 19, 1931.

Present, Prentis, C. J., and Holt, Epes, Hudgins and Browning, JJ.

The opinion states the case.

*White & Temple, R. T. Wilson* and *E. H. Brownley,* for the plaintiffs in error.

*J. O. Heflin* and *Richard H. Mann,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

The plaintiffs in error, hereinafter called the defendants, complain of a judgment against them for $10,000.00. The defendant in error, hereinafter called the plaintiff, complains of the action of the trial court in reducing to $10,000.00 the $25,000.00 verdict awarded him by the jury.

The defendants, one a foreign, the other a Virginia, corporation, closely inter-related, were engaged in the business of buying and distributing in wholesale quantities petroleum products, including gasoline and kerosene, in the cities of Petersburg and Hopewell. On January 31, 1929, the defendants purchased of the Elk Refining Company a car of kerosene oil, which was shipped to Petersburg and arrived at its destination on February 4th. The contents of this car, claimed to be 8,170 gallons of kerosene, were analyzed before it was shipped and on arriving at its destination in Petersburg

were given what is called the "hand test." One of the witnesses stated that to give the "hand test" is to dip the hand in the fluid, with the result kerosene will sting and burn the hand, while gasoline will evaporate quickly and leave a little discoloration, or white mark.

After the test, the product was placed in a kerosene storage tank the capacity of which was 22,500 gallons. How much fluid was in the tank at the time or how much was subsequently placed therein does not appear.

On February 7th, the defendants, through their agent, H. J. Hart, were engaged in delivering kerosene in Hopewell. He made one trip in a Reo auto truck, which broke down. He then went to Petersburg and obtained a larger truck which had three compartments and was used for transporting both gasoline and kerosene.

This truck was backed up to the kerosene pipe line leading from the storage tank and Mr. Hart states that he took "the dome cap off and looked inside." The capacity of the three compartments was 202, 204 and 206 gallons, respectively. It does not affirmatively appear that the cap was taken off of each of the compartments, nor was there any measurement made of the fluid as it was put into the truck; it was simply filled and immediately taken from Petersburg to Hopewell, where 228 gallons of fluid thought by both buyer and seller to be kerosene was sold and delivered to W. L. Partin, who was engaged in peddling kerosene oil for domestic use, which fact was known to the defendants.

While the fluid was being transferred, at night, from the defendants' truck to Partin's wagons he noticed an odor like gasoline and called the agent's attention to it. Hart replied: "I know what I got on; it is kerosene." Partin asked him: "Are you sure it is kerosene? It looks like it is going pretty high to me." Again the agent assured him that it was kerosene. Relying on these assurances, Partin's wagons were

loaded with the fluid for the purpose of being sold at retail the following day.

The wagons were usually driven by W. L. Partin and his son, Bolling Partin, but on the morning of February 8th W. L. Partin was summoned to jury service, so he obtained the services of another son, John Partin, who occasionally drove one of his wagons, to take the one he had intended to drive over the regular route for that day. John Partin sold two gallons of the fluid to William W. Nicholas, the plaintiff in this case.

On Saturday, February 9th, when Bolling Partin was going over the route, he received complaints about the fluid he had delivered the day before, and upon investigation found that some purchasers claimed that the product he had delivered to them was gasoline. He examined the fluid, poured some of it in water and struck a match to it, whereupon it "went off," which convinced him that it was gasoline, and he so reported to his father that night. W. L. Partin and Bolling together made the same test, with the same result, which convinced W. L. Partin, also, that it was gasoline.

He immediately called the officers of the defendant companies and in response to this call they came to his house on Sunday, when the same test was applied before them. Thereupon they authorized him to gather up the product, stating that they would give him 300 gallons of kerosene in place of the fluid which had been sold him.

Bolling Partin had replaced some of the fluid on Saturday, both he and his father replaced other on Sunday and on the following Monday.

The fluid sold the plaintiff was not replaced, W. L. Partin claiming that he had no list of customers and did not know that any had been delivered to him. Early on the morning of February 21st the plaintiff, thinking his two-gallon can had been filled with kerosene, poured some over the wood and kindling in his cook stove, set the can several feet from the

stove, just how far does not appear, and struck a match to start the fire. Thereupon the vapor in the air became ignited and the can of gasoline exploded, scattering its contents over him, which caused him to be severely and painfully burned and permanently injured. He instituted this action, with the result before noted.

The evidence showing that some of the 228 gallons of fluid was gasoline and not kerosene is the testimony of the plaintiff and a neighbor who came to aid him at the time of the accident, the way the explosion occurred, the statements of W. L. Partin and his son Bolling, who made numerous tests after complaints were made to them; and H. B. Goodson, who purchased some of the fluid for use as kerosene and who stated that he thought it was gasoline because "it smelled like it, burned like it and acted like it on the wick, flared around on the wick;" which evidence was not contradicted by direct testimony.

The only expert who testified was the chief chemist of the Elk Refining Company, who stated that before the car left West Virginia he made an analysis of the fluid and it was kerosene.

There was sufficient evidence before the jury for it to find that the substance which caused the injury was gasoline, or at least if it was not gasoline it contained a mixture of gasoline which rendered it a dangerous commodity to be used for the domestic purposes for which kerosene is used.

In similar cases the manufacturers are usually held liable for injuries to the ultimate consumers who are themselves free from negligence. *Kentucky Independent Oil Co.* v. *Schnitzler,* 208 Ky. 507, 271 S. W. 570, 39 A. L. R. 979, and note; 17 A. L. R. 698; *Waters-Pierce Oil Co.* v. *Deselms,* 212 U. S. 159, 29 S. Ct. 270, 53 L. Ed. 453.

The defendants here are distributors and not manufacturers. It was necessary for the plaintiff to prove that they knew, or in the exercise of due care they should have

known, of the dangerous character of the fluid sold for kero-.
sene, and which they knew was to be retailed to the ultimate
consumer as such. *Chapman* v. *Pfarr,* 153 Iowa 20, 132
N. W. 957.

The defendants' officers testified that a person handling
the two products every day could tell the difference and that
the difference could be told by sight or feel.

■ · The conversation which W. L. Partin claims to have
had with the defendants' agent at the time of delivery of the
228 gallons is not denied by the defendants. On that occasion
Partin was lulled into a sense of ·security by the positive state-
ment of the agent of the defendants. On Sunday when the
officers ·of the defendant companies were shown the fluid by
W. L. Partin, and a crude test was made before them they
did not assert that it was kerosene, but simply requested
W.·L. Partin to recall all of the 228 gallons which they had
sold him, and told him that they would make good not only
that loss but any loss which he might incur by reason of the
fluid having become mixed with other kerosene on hand,
either in his hands or in the hands of his customers. If the
defendants, by mistake, had delivered a highly explosive
product, such as gasoline, instead of kerosene, it was their
duty on discovering the mistake· to exercise due care to see
that the public for whom the product was designed was not
permitted to remain in ignorance of the character of the com-
modity they had bought, and· simply offering to make good
the wasted material does not constitute this degree of care.

The negligence of Partin in accepting and delivering gaso-
line as kerosene oil and in failing to warn the plaintiff or
substitute kerosene for the fluid delivered him· does not relieve
the defendants of liability. *Waters-Pierce Oil Co.* v. *Deselms,*
212 U. S. 159, 29 S. Ct. 270, 53 L. Ed. 453, 462, 463, 17
A. L. R. page 700, and note; *Kentucky Independent Oil Co.*
v. *Schnitzler,* 208 Ky. 507, 271 S. W. 570, .39 A. L. ·R. 979
and note, 980, 984,· 986.

The defendants complain of an instruction given which told the jury that there was no liability on the defendants unless the jury believed from the evidence that the fluid was so obviously gasoline and not kerosene as to charge the defendants, or their agents, with knowledge of its character as gasoline. When Bolling Partin was on the stand the defendants cross-examined him specifically about two complaints that were made to him. The questions and answers thereto are as follows:

"Q. What complaint did she make? A. She asked me was it gasoline. I told her not to my knowing it was not gas. She said try it. I put some on some water in a puddle and stuck a match to it and it went off.

"What complaint did she make—what did she say was wrong? A. She said it puffed up in the stove, blowed the top off, or something like that.

"Q. Don't say like that—what did she say? A. Blowed the top off and blowed soot all over the house.

"Q. Is that all she said? A. She said it was gasoline. * * *

"Did anyone else complain to you on that Saturday? * * * What complaint did she make? A. She said it was gasoline. She did not burn any. Took it down the hill and poured it out.

"Q. What complaint did she make? A. She said it was not kerosene; she smelled it and knew it was gasoline and when her husband came home he carried it down the hill and poured it out."

The evidence conclusively establishes that the fluid referred to was a part of the 228 gallons sold by the defendants. The parties making complaint were housewives and it is not presumed that they had had as much experience in dealing with petroleum products as the defendants.

■ On the night that the agent of the defendants delivered the product to W. L. Partin, his attention was specifically called to the nature of the fluid and, without making any examina-

tion or any test, he dogmatically stated that it was kerosene. The evidence shows that the defendants were dealers in both gasoline and kerosene; that the same trucks were used to deliver both commodities; that one of these commodities is of a highly dangerous character when used in kindling fires and that the other is customarily so used and is free from danger when used with due care. When it subsequently developed that a part of the same fluid before being used was recognized as gasoline by inexperienced parties, the failure of the defendants to have the remaining contents analyzed, their apparent acceptance of the fact that it was gasoline when its condition was called to their attention by Partin, are circumstances from which the jury might infer their negligence.

A case very similar to this is that of *Ellis* v. *Republic Oil Co.,* 133 Iowa 11, 110 N. W. 20, in which the court sustained a recovery. In Iowa it is a violation of the statute to distribute gasoline or kerosene without a certificate showing that the same has been duly inspected. In the case of *Chapman* v. *Pfarr, supra,* the court held: That where a retailer was engaged in the sale of kerosene oil for domestic uses and a customer who had purchased some of the oil complained to him of the fact that it was a mixture of gasoline and kerosene, and that notwithstanding the complaint the retailer continued to sell the mixture without having it examined, then he was negligent.

█ It is a matter of common knowledge that gasoline is a highly inflammable substance, and while it is constantly used as a means of power it is very dangerous when used as a substitute for kerosene oil for domestic purposes. The common law requires a higher degree of care and vigilance in dealing with a dangerous agency than is required in the ordinary affairs of life and business which involve small risk of injury.

As said by Judge Buchanan in the case of *Standard Oil*

*Co.* v. *Wakefield,* 102 Va. 824, 47 S. E. 830, 831, 66 L. R. A. 792:

"It seems to be a well settled rule of the common law that a person who negligently uses a dangerous instrument, or article, or causes or authorizes its use by another in such a manner or under such circumstances that he has reason to know that it is likely to produce injury, is responsible for the natural and probable consequences of his act to any person injured who is not himself at fault."

In the same case Judge Buchanan quotes with approval from Thompson on Negligence, Vol. 1, sec. 821, as follows:

"The doctrine of these cases, stated in a general way, is that if a person sells goods, chattels or machinery which possess some concealed defect, or tendency to do harm, such as will, according to the probabilities of ordinary experience, do harm to innocent persons, he must respond in damages if such harm ensue without the intervention of the negligence or fault of others; and upon principle it would be immaterial whether the knowledge of the concealed vice or defect was withheld from the purchaser through the vendor's unskillfulness, ignorance or fraud."

Under all the circumstances in this case, we cannot say as a matter of law that the defendants were free from negligence.

The judgment finally entered by the trial court satisfies neither the plaintiff nor the defendants.

The defendants contend that the very fact that the jury rendered a verdict of $25,000.00 shows that they were influenced by either passion or prejudice, and misconceived or misinterpreted the facts and the law, and hence were incapable of finally passing upon the fact of liability, as well as the question of damages.

The plaintiff contends that a trial judge has no right to disturb a verdict unless it is made to appear that the jury has been actuated by prejudice, partiality, or corruption, or that

they have been misled by some mistaken view of the merits of the case, citing *Colonna Shipyard* v. *Dunn,* 151 Va. 740, 145 S. E. 342; *Norfolk & P. B. L. R. Co.* v. *Parker,* 152 Va. 484, 147 S. E. 461.

The trial judge is more than a mere umpire in the trial of a common law action. Whether or not the sum awarded by the jury is inadequate or excessive is a legal question addressed to the sound discretion of the court, to exercise his supervisory power over verdicts to prevent gross miscarriage of justice. There are many incidents which occur in the trial of a common law case which a trial judge observes but which cannot be reproduced in the cold printed page. When, therefore, the trial court has made his ruling on such questions it will not be disturbed by this court unless it appears that there has been an abuse of his legal discretion. The principles by which courts should be guided in dealing with such questions have been stated and restated so often that it is only necessary to refer to some of the cases: *C. & O. Ry. Co.* v. *Arrington,* 126 Va. 194, 101 S. E. 415; *Bishop* v. *Webster,* 154 Va. 771, 153 S. E. 832, 155 S. E. 828; *Norfolk & P. B. L. R. Co.* v. *Parker,* 152 Va. 484, 147 S. E. 461.

The learned trial judge in this case filed a written opinion giving a summary of the facts with such convincing reasons for his action on the question of damages that we shall adopt as our own that part of his opinion which deals with this subject.

"I think this sum ($25,000.00) excessive. The damages sought were compensatory damages, to which the defendants were subject only on the score of simple negligence. The elements of such damages are well enough known to obviate any labored enumeration of them. In awarding such damages, the object of the law is to put the defendant as nearly as possible *in statu quo*. The only elusive element in the case, not susceptible of exact calculation, is the element which would represent the pain and mental anguish suffered by the

plaintiff in consequence of his injury. An award based on this element of recovery is, therefore, to be regarded with some degree of liberality. * * *

"There is no doubt of the existence of positive physical injury in this case. The plaintiff was burned. There are scars upon his person in consequence of burns received by him as a result of the explosion, but there is no disfigurement of his face, no impairment of his eye-sight, no enduring shock to his nervous system, according to the testimony of his physician. He has, it appears, substantially regained his health, the substantial evidences of his unfortunate experience are, a crippled little finger, a weakness in one ankle, and some lack of address in the use of this ankle and of a forearm, or wrist. His physician testified that he would probably entirely recuperate, and, except for the scars on his body and the injury to his finger, be probably without any permanent disability. It is to be mentioned, nevertheless, that the areas on his person which were the subject of the burn will be more susceptible to cold, or atmospheric conditions in cold weather than would be the case had not the tissues of the skin been burned as they were. This will probably be a permanent pathological condition. I think this a fair summary of the nature and extent of the plaintiff's injuries.

"The plaintiff, according to the evidence, is a 'rigger,' whose occupation involves climbing in the course of structural work on buildings. He is between thirty and forty years of age, and has been receiving in wages about $5.00 a day when employed, though he testified that these wages were rather a minimum, than an average, compensation of men in his calling.

"I have always felt loath to revise awards made by juries in cases of this kind. The verdicts of juries are, nevertheless, subject to revision and must stand or fall with reference to accepted principles of the law. If the plaintiff were employed every day at a wage of $6.00 a day in his craft, his

income would be about $1,900.00 per annum, assuming that he should lose no time except on Sundays. The award of the jury here, $25,000.00, if invested at six per cent would afford him an income, without any activity on his part, of $1,500.00 a year for life, without impairment of the principal, and leave the sum of $25,000.00 as a permanent augmentation of his estate at his death. This effect would be to put the plaintiff in a better position than he probably would have been if he had never suffered injury at all; and there seems to be no reason why he should not earn, an addition to the income from this fund, by some form of employment, possibly as much again in daily wages. True, he states, that he does not think he will ever be qualified to follow his occupation of 'rigger' again, but he is still, in the main, physically capable and competent, and no essential disability appears to prevent him from seeking other gainful employment at his time of life.

"The recent opinion in *C. & O. Railway Company* v. *Arrington*, 126 Va. 194, 101 S. E. 415, delivered by Prentis, J., compels me to weigh these details with some care. It is held in that case that juries are not at liberty to throw all discretion to the winds, and to make award of damages without some regard to the circumstances of the case. The current of decisions produced before the court and referred to by the learned judge, now Chief Justice of the Supreme Court of Appeals of this State, constrains me to hold that the verdict of $25,000.00 in this case is excessive, and convinces me that the sum of $10,000.00 would be amply adequate in all human probability to serve as a proper compensation for the plaintiff here."

*Affirmed.*