# Richmond

## ELIZABETH W. YOUNG v. C. M. MERRITT, C. L. GRAHAM AND B. A. JOHNSON.

May 1, 1944.

Record No. 2780.

Present, All the Justices.

The opinion states the case.

*Swink, Swink & White*, for the plaintiff in error.

*W. R. Ashburn*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This is an action for unlawful arrest and false imprisonment. A jury returned a verdict for the plaintiff, Eliza-

beth W. Young, in the sum of $1,000 against C. M. Merritt. C. L. Graham and B. A. Johnson, co-defendants with Merritt were found not guilty. On motion of Merritt to set aside the verdict against him as contrary to the law and the evidence, the trial court, holding that it was of opinion that the award was excessive, put the plaintiff upon her election to have the verdict set aside and a new trial awarded, or remit the said amount to the sum of $330. No grounds were assigned for its opinion. The plaintiff elected to accept $330 under protest, subject to a review by this court, and thereafter obtained this writ of error. Virginia Code, 1942, (Michie) section 6335.

Since the jury has fixed liability on the defendant, after hearing conflicting evidence, its verdict, approved by the trial court, is conclusive as to his liability, so that the only question for our consideration is whether or not the action of the court in requiring the *remittitur* can be justified.

The evidence and the circumstances were as follows:

Miss Elizabeth W. Young, at the time of the occurrences hereinafter mentioned, was twenty-one years of age and resided with her parents in Mt. Joy, Pennsylvania. She was private secretary to an official of the Armstrong Cork Company, and engaged in defense work. She had a friend, Marshall W. Webb, a resident of her home town, whom she had known her entire life. He had become a member of the United States Coast Guard, and was stationed at the Coast Guard reservation in Norfolk, Virginia.

At the request of Webb, she arranged to visit him in Norfolk during her vacation period. Her sister, Thelma, eighteen years of age, also had a friend, a soldier, Albert Brayman, now Lieutenant Brayman, then stationed at Camp Pickett, near Blackstone, Virginia. He arranged for a short leave when the two young women should come to Norfolk. By prearrangement, the two girls arrived in Norfolk late Saturday night, July 25, 1942. They were met at the station by the two service men, and being unable, at that hour, to get the reservation previously requested for them at the

Monticello Hotel, they obtained a room at the Atlantic Hotel.

The four young people spent the following day, Sunday, at Virginia Beach, and on their return to Norfolk that afternoon, the two young girls secured a room at the Monticello Hotel, duly signed the hotel register, and transferred their personal effects thereto.

Brayman had to return to duty at Camp Pickett that evening, so Webb obtained a fellow member of the United States Coast Guard, whom he knew favorably, as a companion for Miss Thelma, the younger sister. They made an engagement to go to the Palamar dance hall that evening, being informed that it was a nice place. The two young men called at the hotel for the girls about 7:30 p. m., and as they were all strangers in the city, they walked around sightseeing. While on City Hall avenue, the street upon which the Monticello is located, they observed a restaurant or club across the street from that hotel, and hearing music they went inside the place, which they afterwards ascertained was called the Arab Tent Club. They ordered near beer, and one of the young men played the nickelodeon by putting nickels in the slot. They were not boisterous and there was no loud conversation or misbehavior of any kind.

Soon after the beer was served, three men in civilian clothes came to the booth where the young people were sitting. These men later turned out to be C. M. Merritt, a police sergeant of the city of Norfolk, and C. L. Graham and B. A. Johnson, police officers of the city, assigned to duty under the sergeant. Miss Thelma was asked by one of the men if the sailor she was with was her husband. She said "No, he isn't." This man then said he wanted to talk to her. All four of the young people got up and Merritt asked them their names, ages, where they were from, and where they were stopping in Norfolk. After this information was furnished, Merritt exhibited his badge and told the girls they would have to leave Norfolk the following morning. They wanted to know why, but he would not give them an explanation. They told him that they had defense

and identification cards in their purses, but he would not look at them. Marshall told the officers that he was responsible for the girls coming to Norfolk, and pulled out his wallet to show his credentials and pictures of his family. Merritt would not look at them. Marshall then offered to pay the expense of a telephone call to Mt. Joy for the purpose of confirming their statements and identification, without avail. The officers refused to listen to any of their explanations and placed the girls under arrest. When Merritt was asked why they were being arrested, he replied in a "sarcastic" tone, "Oh! you wouldn't understand." The officers took hold of the girls' arms, led them to a police car, and drove them to police headquarters. There they learned they were charged with vagrancy, under Virginia Code, 1942 (Michie) section 2808, upon complaint and information made by Merritt before a justice of the peace. They were locked in an unlighted, unkempt cell with another woman who was partially undressed, repulsive looking, and apparently under the influence of some intoxicant.

After the arrest, the young men followed on foot to the police station, approximately two blocks away. All of the information they could get from the desk sergeant was that the girls were charged with vagrancy, and that bail was set at $50 for each of them. After the girls had been in the cell between one and a half and two hours, the young men succeeded in obtaining their release on bail, in the sum of $25 each, to appear in police court the following morning. At the suggestion of the justice of the peace, the bail officer, they appeared before the police justice in chambers the next morning. The girls explained their situation to the police justice. Sergeant Merritt was then asked if their statements were correct, and he replied that they were. He next asked Merritt what the girls were charged with, and his reply was that they were charged with vagrancy under the State statute. Merritt was then asked by the police justice, if the girls "looked like prostitutes," and the sergeant said "No." They were then released and the warrants dismissed. Merritt did not express any regret or offer any apology for his actions.

The Misses Young had expected to spend a week in Norfolk, and had originally bought round-trip tickets for their return the following week-end. They said that on account of the experiences on Sunday evening, they could not eat, sleep, or enjoy themselves, so they returned home on Wednesday morning; but that it was months before they got over their shock and embarrassment.

The girls had identification cards, round-trip tickets, and the room key to the Monticello Hotel in their purses. Miss Elizabeth had letters in her purse from Webb and Miss Thelma had letters from Brayman. They were not searched or their purses taken from them.

The registration card of the Monticello Hotel showed the registration of both girls as of July 26, 1942, in room 611, and their departure therefrom on July 29, 1942.

The evidence introduced on behalf of the defendant disclosed the crowded congestion in Norfolk by reason of wartime activities; that the Arab Tent Club was known to the police as a place frequented by persons of ill repute; that Merritt had a good reputation for efficiency, truth, and veracity, and had been assigned to duty as special investigator for the office of the Commonwealth Attorney. Each officer testified that they were not rude or disagreeable to the girls, and that they were merely performing their required duties in an orderly way.

Merritt said that, after Miss Thelma had told him she and her sister had arrived in Norfolk on Saturday, the 25th, and registered at the Monticello Hotel, by a prearranged signal, he nodded to officer Graham to check the accuracy of her statement by questioning the clerk at the hotel; that when officer Graham returned within a few moments and indicated by negative signal that they were not registered at the Monticello, he told the girls they would have to accompany him to the police station. He further said neither the girls nor their escorts offered any explanation of their presence in the Arab Tent Club, the reason for their visit to Norfolk, or any identifying particulars.

Graham testified he understood one of the girls to say that they registered at the Monticello on the day of their arrival in Norfolk, July 25th, and he did not inquire from the hotel clerk whether they had registered on any other day or had any room reserved there, and he relied upon the statement of the clerk that they had not registered on the 25th.

Johnson said he took no part in the conversation, and acted at all times under the direction of Sergeant Merritt. He testified also that the girls offered no identifying papers or explanation of their presence in the Arab Tent Club or reason for being in Norfolk.

■ In a case of this character, there is no rule of law for fixing the quantum of compensatory damages, nor can it be reached by any process of computation that we know of. The following statement from Burks Pleading and Practice, Third Edition, page 517, has been frequently approved by this court:

■ "Where there is no legal measure of damages, the rule is believed to be without exception that the verdict of the jury can not be set aside unless it is so grossly excessive (or inadequate) as to indicate that the jury has been actuated by prejudice, partiality, or corruption, or that they have been misled by some mistaken view of the merits of the case."

*Boyd* v. *Boyd*, 116 Va. 326, 82 S. E. 110, Ann. Cas. 1916D, 1173; *Kress & Co.* v. *Musgrove*, 153 Va. 348, 149 S. E. 453; *Weatherford* v. *Birchett*, 158 Va. 741, 164 S. E. 535.

In *Boyd* v. *Boyd, supra*, $1,500 was held not excessive for slander.

In *Kress & Co.* v. *Musgrove, supra*, $750 was allowed for false imprisonment.

In *Weatherford* v. *Birchett, supra*, we affirmed a verdict of $2,000 for slander and malicious prosecution.

On the question of excessive damages in verdicts, also see *Hoffman* v. *Shartle*, 113 Va. 262, 74 S. E. 171; *DuPont De Nemours & Co.* v. *Taylor*, 124 Va. 750, 98 S. E. 866; *Farris* v. *Norfolk, etc., Ry. Co.*, 141 Va. 622, 126 S. E. 673;

*American Oil Co.* v. *Nicholas,* 156 Va. 1, 157 S. E. 754; *Remine* v. *Whited,* 180 Va. 1, 21 S. E. (2d) 743.

In this case there is not the slightest suggestion that the jury were influenced by corrupt motives, governed by prejudice or passion, or misled by any mistaken view of the case.

It is difficult to conceive of a situation more embarrassing and humiliating to a young woman than the experience imposed upon Miss Elizabeth Young. It is easy to appreciate the pain, insult, humiliation, mental suffering, and embarrassment to which she was subjected. It is not hard to understand the shock and horror with which she reviewed her experience during the ensuing weeks.

■ The character of the defendant is of no value in determining the damages sustained by Miss Young. The insult and shock suffered by her was not lessened by the fact that he bore a good reputation for efficiency and character.

■ It is true that the duties required of a police officer, under conditions prevailing in the city of Norfolk, where thousands of soldiers and sailors daily gather, and women of ill repute are in attendance, are most difficult. It is also a matter of common knowledge that a large majority of service men are highly moral, and that their families, relatives, acquaintances, and sweethearts, following normal impulses, visit them at their posts of duty remote from their homes and firesides. In the enforcement of law the latter are entitled to protection.

■ It is the duty of a police officer to exercise intelligence, patience, and discretion in discriminating between those of good repute and those of ill fame. He should not stand by a place known to him to be of ill repute and give no notice to innocent and unwary strangers, but should give intelligent consideration, patience and understanding to fair explanations, appearances, and other evidence, and not act hastily.

The jury had ample evidence that Miss Young and her companions gave Merritt every reasonable opportunity to ascertain her identity and innocence.

The charge against the plaintiff in error was one of a serious nature and was made without the slightest foundation. Little excuse has been offered for it. The charge in the warrant and the circumstances leave no doubt as to the nature of the suspicions Merritt entertained as to the character of Miss Young. That this was unwarranted should have been as apparent to him as to the police justice, if he had been properly observant and had listened to the explanations of the young woman and her companions. It seems unreasonable to believe that she and her friends offered no explanation of their presence in Norfolk, or failed to attempt to show their credentials.

The record fails to disclose any standard by which the trial court could have measured the reduction from the award of the jury. This is peculiarly a case in which fair, impartial, and intelligent jurors were as capable of fixing the measure of damages as the court itself. Perhaps, the jury, as a whole, was more capable when it is considered that the verdict was the reasoned opinion and composite judgment of a group of seven acceptable men.

We cannot say that $1,000 is excessive or manifestly out of line. On the other hand, we are quite sure that many young women would be unwilling to undertake the experience of Miss Young for the full amount of the jury's verdict. The jury having fairly considered all of the facts and circumstances of the case, the defendant has no just cause of complaint.

The trial court, therefore, having erred in reducing the verdict of the jury, judgment will be here entered that the appellant recover $1,000, the amount found for her by the jury, with interest thereon from May 24, 1943, the date of the verdict, until paid, and the costs of this proceeding.

*Reversed and final judgment.*