Oscar Lee Frazier, one of the plaintiffs herein, was seriously injured and his son, John Phillip Frazier, aged eight and one-half years, fatally injured, from an explosion in his home of a mixture of gasoline and kerosene he purchased from Russell T. Dupree, owner and operator of a filling station in the village of Bentley, Louisiana. He sues to recover damages sustained by him individually, and he and his wife, Una Frazier, sue for additional damages on account of the son's death. Richardson Ayres, Jack Sistrunk and Albert Clark of Rapides Parish and Dupree are impleaded as defendants against whom judgment in solido for a large amount is sought.
The material facts of the case, with one exception, are undisputed.
Ayres is a distributor or jobber of petroleum products in the City of Alexandria, Louisiana. Dupree is a retailer of such products and was a patron of Ayres. Late in the afternoon of December 3, 1942, Ayres' tank truck in charge of Sistrunk, with Clark as helper, arrived at Dupree's filling station to deliver into his tanks gasoline and kerosene. The tank consisted of five compartments, three of which were full, one with white gasoline, one with red gasoline and the third with kerosene. Dupree's gasoline tank was underground. Gasoline was run into it through a hose attached to a compartment of Ayres' tank. When it was thought that all the gasoline desired by Dupree or to which he was then entitled, in view of rationing, had been transferred into his tank, being the entire content of one of the compartments, the truck was backed close to the entrance of a room near the station wherein a 120 gallon capacity kerosene tank, above the ground, was located. Sistrunk removed the cover to the opening in the tank at the top end, looked into it and estimated that it was about one-half full. In order to know the exact quantity necessary to fill it, he decided to use five gallon cans or containers. When the first container was filled Clark carried it to Sistrunk who began to pour the liquid into the tank and when about one-half of it had been poured he detected an odor as of gasoline. Examination revealed that the can contained pure gasoline. It was then discovered that the entire content of the compartment containing kerosene had been put into the gasoline tank. Dupree, who to that time had been in his residence adjacent to the station, was called to the front and Sistrunk and Clark say that the two errors were then made known to him, but Dupree denies that they or either of them told him that the kerosene tank had any gasoline in it.
After these men ceased their discussion of the matter Dupree closed the gasoline pump and locked the mechanism to prevent sales therefrom until the error could be corrected. He took no precaution to prevent sales from the kerosene tank. Sistrunk and Clark drove off. Dupree was advised by Sistrunk not to sell any of the contaminated liquid in the gasoline tank and was assured that it would be promptly removed therefrom so that pure gasoline could be put in it. This was not done, however, until after the tragic accident that cost the life of plaintiffs' young son.
At the close of business Saturday night, December 5th, practically all of the content of the kerosene tank had been sold by Dupree or his employees to various customers; in fact, all of it that the pump would lift had been sold. Plaintiff, Oscar Lee Frazier, without any knowledge of what had happened, purchased from Dupree for domestic purposes, eight gallons of the mixture believing it to be kerosene.
Early in the morning of December 6th, plaintiffs' daughter, aged thirteen, got out *Page 756 
of bed, assembled some pine splinters, pine and oak wood in a medium sized box heater in the bedroom in which her father was sleeping, set fire thereto with a match and assuming that the fire would develop properly, returned to bed. After the lapse of not more than thirty minutes Oscar Lee Frazier got out of bed, followed by his young son, and proceeded to the heater. It was not giving off the expected heat. He opened its top and door and satisfied himself that the fire had "gone out". He testified that after having done this he got a gallon can of the liquid purchased from Dupree and poured about one-half pint of it on the wood in the stove. He then turned with can in hand to procure a match with which to start the fire, and had moved not more than five feet when an explosion occurred in the stove. The flames therefrom reached the open can, still in his hand, causing another explosion. Burning liquid was scattered over the room and upon him and his boy who was by his side. The can was knocked from his hand.
Plaintiffs' suit as against Sistrunk and Clark is predicated upon their alleged gross negligence in putting gasoline in the kerosene tank and allowing it to remain therein after discovery of the mistake. Ayres is sued, of course, because he was the principal of Sistrunk and Clark and is responsible for their negligence. The suit as against Dupree is predicated upon his alleged failure, after learning that kerosene had been put in his gasoline tank, to make proper investigation and check of the kerosene tank to ascertain if gasoline had been erroneously put therein. Plaintiffs do not charge Dupree with knowledge that gasoline was by mistake put into his kerosene tank.
Dupree did not file answer. As to him, issue was joined by default but the trial judge overlooked this fact and in written reasons for judgment stated that as issue had not been joined judgment affecting this defendant one way or other could not be rendered. Counsel of plaintiffs has fallen into the same error. The other defendants answered; that of Sistrunk and Clark being joint. The answers are substantially the same. All defendants admit that 120 gallons of kerosene were erroneously put in the gasoline tank and that about two and one-half gallons of gasoline were put in the kerosene tank before the errors were discovered. They all aver that Dupree was admonished by Sistrunk not to sell any of the mixture from either tank and that Sistrunk told him he or some other agent of Ayres would return promptly and pump the mixture from the tanks. They specially aver that notwithstanding said admonition, and with full knowledge that the gasoline had been poured into the kerosene tank, Dupree sold portions of its contents to several of his customers, including Oscar Lee Frazier. They plead that the small quantity of gasoline put in the kerosene tank did not increase the combustible and inflammable potentialities of the mixture above that of kerosene; that the act of Frazier in pouring some of the mixture on the wood in the heater, knowing that a fire had been started therein a few minutes prior, was gross negligence and carelessness on his part, and constituted the proximate cause of the accident. These defendants plead alternatively that if the mixture in the kerosene tank was more dangerous from a standpoint of combustion or explosion than was pure kerosene, the action of Dupree in selling same with full knowledge of the character of the mixture, was an independent act of negligence from that of the other defendants, and, as such, became and was the proximate cause of the accident. This phase of the defense, in effect, is tantamount to saying that Dupree's negligence, being independent and intervening, broke the chain of causation and thereby the original negligence of Sistrunk and Clark, if any, became the remote cause of the accident.
Further, in the alternative, these defendants plead in bar of recovery by Oscar Lee Frazier, his own negligence and carelessness in the respects above stated.
There was judgment in favor of plaintiffs and against Ayres, Sistrunk and Clark, in solido for $6,000, and in favor of Oscar Lee Frazier, individually, and against said defendants in solido for $7,500, and costs. Ayres only appealed. Plaintiffs do not complain because no judgment was awarded them against Dupree. Therefore, the liability of Ayres, if any, to plaintiffs is the sole question tendered by this appeal.
The trial judge did not resolve the main issue of fact over which there is serious disagreement, it being whether or not Sistrunk and Clark or either of them told Dupree that gasoline had been put in the kerosene tank. He held that the liability of the other defendants would be unaffected even though Dupree knew of both errors. In other words, he held that under *Page 757 
the undisputed facts, even though Dupree did sell the mixture, knowing of its contamination, the chain of causation was not broken, and therefore, his action did not relieve Ayres, Sistrunk and Clark from their original liability to plaintiffs.
We are not favorably impressed with the contention that after the gasoline was put in the kerosene tank the explosive and combustible potentialities of the liquid therein were not materially enhanced over those of pure kerosene. The fact that the explosion did occur with such disastrous results disproves the contention. This identical question was involved in the case of Waters-Pierce Oil Company v. Deselms, 212 U.S. 159, 29 S.Ct. 270, 43 L.Ed. 453. There 300 gallons of gasoline were erroneously put into a tank of 6,600 gallons of kerosene. There, as here, four per cent of the mixture was gasoline. The company's agents believing the mixture no more dangerous than pure kerosene sold some or all of it for kerosene. Damages resulted from the use of some of the mixture to the defendants in error. The company was held responsible therefor. The various courts that reviewed the case all reached the conclusion that the addition of the gasoline to the kerosene produced a mixture much more dangerous than was kerosene.
The analysis made by Dr. Max Gisler, chemist of Houston, Texas, of a purported sample of the mixture in the present case showed only .7 of one per cent gasoline content. Evidently the sample delivered to Dr. Gisler, for some reason, was not a dependable specimen of the liquid. Perhaps, because it was from the bottom of the tank accounts for the smallness of the gasoline content. Experiments made from a sample of the liquid sold to Frazier, and also to another person, proved unmistakably a flash point higher than that of kerosene. It is also shown that another person was killed from an explosion of some of the mixture. Aside from all this, it is admitted that two and one-half gallons of gasoline were put in the sixty gallons of kerosene.
[1, 2] It is well settled by the jurisprudence of all the states, including our own, that mistakes of the character involved herein, constitute negligence and that the person or persons responsible for such mistakes, whether he be manufacturer, wholesaler or jobber, may be held in damages for injuries that result therefrom, not only to the retailer but, as a rule, to the ultimate consumer. Due to the inherently dangerous character of gasoline and other highly explosive and/or inflammable substances those who manufacture, distribute or sell them are required to employ and observe due care in doing so; in fact, the utmost care is required of them to the end that those who consume or have occasion otherwise to have contact therewith may be reasonably protected from injury. 35 Corpus Juris Secundum, Explosives, § 6, subsec. d; 24 Am.Jur. 615, § 129; Waters-Pierce Oil Company v. Deselms, 212 U.S. 159, 29 S.Ct. 270, 43 L.Ed. 453; Moore v. Jefferson Distilling 
Denaturing Co., 12 La. App. 405, 123 So. 384, and authorities cited therein.
In a case of this character liability for resultant injuries does not in the least depend upon the relation to the public of the person or persons responsible for the original error. It is the failure of such person or persons in his or their duty to the public, and especially to the innocent consumer or consumers that determines the question of liability. The original mistake, if knowingly continued by others, it is possible, could expose to liability each and every person participating in the chain of negligence. Of course, to some extent the particular facts of each case, in the final analysis, control ultimate legal conclusions.
The greater number of reported cases dealing with this subject involve the manufacturer and consumer, but, as before stated, the wholesaler, distributor, jobber, dealer and retailer, regardless of the descriptive appellation of his business, is amenable to the same rule of liability as is the manufacturer or producer.
[3] Pertinent to this question we quote from 35 Corpus Juris Secundum, Explosives, p. 235, § 6, subsec. d, viz.: "Where a wholesale dealer or manufacturer sells oil or other explosives in violation of statute, or with knowledge and without warning of their dangerous character, his liability is not confined to his immediate purchaser, but extends to subsequent purchasers; nor is he absolved from such liability by negligence of the retail dealer in selling such explosive or failing to warn his customers after discovering the dangerous character thereof. It may be shown that the adulteration of oil was the result of improper manufacture, as well as of admixture after manufacture. * * *" *Page 758 
We quote also from 22 Am.Jur. 195, § 71, as follows: "The authorities are practically agreed that when a manufacturer or producer puts on the market for use without notice of its dangerous quality an article that is imminently or inherently dangerous, such as an explosive or an article which is capable of explosion, he will be liable in damages to any person who, in the exercise of ordinary care, suffers injury as a result of the dangerous quality of the article; * * * any person injured by such article may have a cause of action against him, although purchasing such article from a third party or retailer, even if the retailer had full knowledge of thedangerous nature of the article and sold it without warning, ifsuch knowledge does not break the chain of causation. If themanufacturer foresaw or should have foreseen the commission ofthe retailer's negligence, he remains liable."
[4-6] But, as is true in accident cases generally, the original act of negligence must have been the or a proximate cause of the accident. The injured person or persons or his or their beneficiaries, in case of death, must have been free of contributory negligence as the or a proximate cause of the accident. Touching this phase of the case we take the following from 24 Am.Jur. 619, § 130: "* * * The proximate cause is that cause which, in a natural and continuous sequence unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. The proximate cause need not be the sole cause. If a third person's act co-operates with the act of the defendant, he may still be liable. An intervening act of a third person may break the chain of causation and obviate liability for the original breach of duty, but to do so, such intervening act must be a superseding cause and one which the original wrongdoer was not bound to anticipate as the natural or ordinary result of his act. The sale, as coal oil, by an oil company to a retaildealer, of an explosive mixture of coal oil and gasoline is theproximate cause of an accident resulting in its use by theconsumer in the ordinary manner."
To support the italicized portion of this quotation, the Waters-Pierce Oil Company case, cited above, is annotated.
A leading case on this interesting subject, cited by Corpus Juris Secundum and Am.Jur., is that of Kentucky Independent Oil Company v. Schnitzler, 208 Ky. 507, 271 S.W. 570, 573, 39 A.L.R. 979. In that case it appears that one Burnside, who conducted a country store, retailed kerosene but not gasoline. He had three cylindrical, above ground, tanks of 55 gallons capacity each. Kerosene was delivered to him by oil companies from tank wagons. The plaintiff company on a certain date delivered to Burnside 35 gallons of high grade kerosene and erroneously 20 gallons of gasoline, but in different tanks. The error was immediately discovered by Burnside and he demanded of the driver that the gasoline be removed. The liquid was poured into each tank through an opening in the top and was withdrawn through a faucet at the bottom. The driver removed 20 gallons of liquid from the tank into which the gasoline had been put by drawing it through the faucet, and refilled the tank with 20 gallons of kerosene of a lower gravity than that of the kerosene he had put into the other tank. He told Burnside that if all the gasoline had not been withdrawn, this lower gravity kerosene would render the mixture harmless. Burnside relied upon this assurance and sold some of the liquid to customers, including the defendant in error, Schnitzler.
In the early hours of a morning a few days thereafter Schnitzler, according to his custom, started a fire in his kitchen stove by pouring some of the mixture upon coal, wood and paper in the open grate thereof. A violent explosion occurred. He was burned so badly that he lived only a short while. His home was destroyed by the fire. Other persons who purchased some of the same mixture had unusual experiences therefrom, such as explosions of lamps. It is evident that the mixture was of a dangerous character. Suit for damages was instituted by the administrator of the decedent's estate. A jury returned a verdict for the plaintiff. The case was appealed to the Court of Appeals of Kentucky where the judgment and verdict were affirmed. In passing, the court said:
"Again are we confronted with the question of the liability of a manufacturer or packer of a defective article for injury to the person of an ultimate consumer who purchased from a middleman. It is, of course, the general rule that a manufacturer or seller of a defective article is not liable for injuries to the person of an ultimate consumer who has purchased from such middleman. See Peaslee-Gaulbert [Co.] v. McMath's Adm'r, 148 Ky. 265, *Page 759 
146 S.W. 770, 39 L.R.A., N.S., 465, Ann. Cas.1913E, 392. But to this general rule there are exceptions. * * *
"Another exception to the general rule of nonliability is where the article manufactured is inherently or intrinsically dangerous to life and limb, and in this class of cases the manufacturer is liable to the ultimate consumer for injuries which result from the manufacturer's negligence in manufacturing or packing or putting upon the market without due warning such article. The liability here does not arise out of contract or deceit, but is based upon the fundamental proposition that, where a person sustains such relations to society that danger to others will result from a failure to use due care in his activities, he owes the legal duty of such care to that class of persons likely to be injured by his failure to exercise it. One who puts on the market articles inherently or intrinsically dangerous to life owes the duty of care to all those persons who ought reasonably to have been foreseen as likely to use them. And such an article is a mixture of gasoline and kerosene. Waters-Pierce Oil Co. v. Deselms,212 U.S. 159, 29 S.Ct. 270, 53 L.Ed. 453. An exhaustive note collecting the authorities in support of this proposition may be found in 17 A.L.R. 683 et seq., and at page 689 may be found the cases covering sales of mixture of gasoline and kerosene for kerosene, as in the case at bar. Under this exception to the general rule falls the case before us, and there could be no question of the liability of appellant to the ultimate consumer for injuries resulting from the inherently and intrinsically dangerous mixture created by its agent and which it knew would be by the middleman resold to the ultimate consumer but for the fact that in the petition as amended it is alleged that, when the mixture was made by the driver, Burnside knew of it, and thereafter, 'with gross and wanton carelessness or negligence,' resold it to the decedent."
The court then proceeded to dispose of the question raised by the pleadings and thereafter said:
"As above stated, liability in a case of this character does not rest in contract or deceit, in which state of case, as we have seen, the knowledge of the middleman of the defect releases the manufacturer from liability to the ultimate consumer. Liability here rests on the duty owed by the manufacturer to the class of persons likely to be injured by his failure to exercise ordinary care in his activities, where danger to them will probably result from such failure.
"Hence the negligence or knowledge of Burnside can have no effect to absolve appellant from liability to the ultimate consumer, except in so far as such negligence or knowledge breaks the chain of causation, if it does. The problem thus presented for solution is the old problem of proximate cause in actions of tort.
"That appellant set in motion forces which ultimately resulted in damage to appellee's decedent of a kind that the law will notice and give redress for must be conceded. Does the fact that a second human actor, not acting in concert with a first human actor, intervenes with a tortious act which begins later in time than a tortious act of the first actor, and which second tortious act is the only force in active motion at the time of the damage, exonerate the first actor from liability? Although the second human actor may be liable, it does not necessarily follow that the first is exonerated. By the decided weight of authority, the first will be liable, if he foresaw or ought to have foreseen the commission of the second's tort. Although the earlier view was that the prior tort-feasor was never liable where a later tort-feasor intervened (see Vicars v. Wilcocks, 1806, 8 East. 1 [103 Eng.Reprint 244]), yet it has gradually come to be admitted that the earlier tort-feasor is liable in cases where the commission of the subsequent unlawful or tortious act, and the happening of the damages ought to have been foreseen by him as not unlikely to follow. A leading case supporting this modern view from this jurisdiction is that of Watson v. Kentucky I. Bridge R. Co., 137 Ky. 619, 126 S.W. 146, 129 S.W. 341."
Concluding on this question, the court said: "Hence the court did not err in overruling appellant's demurrer to appellee's petition; and, as Burnside's ignorance or knowledge of the presence of the mixture and his negligent act in its resale, if it was negligent, were absolutely immaterial so far as appellant's liability in this case is concerned, it follows that the allegation in the petition of Burnside's negligence in the resale of the mixture was an immaterial allegation and hence surplusage, which neither adds nor detracts anything from the pleading. * * *" *Page 760 
[7] The reason given by the court why the chain of causation was not broken in that case applies with equal force to the facts of the case before us. Ayres' agents set in motion forces that ultimately resulted in injury to one person and in the death of another. He knew that Dupree was a retailer and that he regularly sold kerosene to his patrons; that he had no kerosene save in the contaminated tank; that it was possible Dupree, in the press of business, would overlook the fact that the tank's kerosene content had become mixed with gasoline and would sell some or all of it or that one or more of his clerks, wholly ignorant of the dangerous character of the mixture, would do likewise; and, in addition to all this, according to Ayres' own allegations, he continued to exercise some control over and interest in the mixture because he promised to promptly remove same from the tank and failed to do so. So long as he allowed the mixture to remain in the kerosene tank his negligence was unbroken and continuous. It was his imperative duty to have immediately removed the liquid from the tank or to have posted thereon a label or sign warning all persons of the dangerous character of the tank's content. As said in the quotation from Am.Jur., supra, Ayres "should have foreseen the commission of the retailer's negligence". He was, as a matter of law, bound to have anticipated, as more than a possibility, that some or all of the mixture would be sold.
The Supreme Court of the United States in the Waters-Pierce Oil Company case, cited above, intimated strongly that the liability of the oil company would have extended to the consumer of the mixture of gasoline and kerosene even though the company's own purchaser had been informed by it of the true character of the liquid sold for gasoline. Touching this question, the court stated [212 U.S. 159, 29 S.Ct. 276]: "But, because we confine ourselves to the particular facts of the case before us, we must not be understood as holding, in view of the dangerous character of the fluid and the putting of the same upon the market by the oil company, with the expectation that it would be retailed to the public, and the violation of the statutory regulations and prohibition concerning the sale of such article, that under the general principles of law sustained by the authorities already cited, a recovery against the oil company might not have been justified, even if the proof had established that Powers Deselms had been informed by the oil company of the dangerous character of the mixture. See, further, Clement v. Crosby Co., 148 Mich. 293, 111 N.W. 745, 10 L.R.A., N.S., 588 [12 Ann.Cas. 265], and Stowell v. Standard Oil Co., 139 Mich. 18, 102 N.W. 227, and authorities cited in both cases."
In the case of American Oil Company et al. v. Nicholas,156 Va. 1, 157 S.E. 754, 756, the Supreme Court of Appeals of Virginia held that after the wholesaler learned that gasoline had by mistake been sold to its customer for kerosene, it was the duty of the wholesaler "to exercise due care to see that the public for whom the product was designed was not permitted to remain in ignorance of the character of the commodity they had bought, and simply offering to make good the wasted material does not constitute this degree of care." In that case the retailer became suspicious that gasoline was being put into his tanks and so informed the oil company's deliveryman, who assured him that it was kerosene. Nicholas purchased some of the gasoline and was injured from explosion thereof in his cookstove when he attempted to start a fire by pouring some of the liquid on the wood therein.
The legal questions here discussed were considered by the Orleans Court of Appeal in the case of Moore v. Jefferson Distilling Denaturing Company, 12 La. App. 405, 123 So. 384. Judge Westerfield, the court's organ, treated the subject somewhat elaborately. It was held therein as disclosed from the syllabi:
"Person who deals with an imminently dangerous article owes public duty to all to whom it may come to exercise care in proportion to peril involved.
"Person who knowingly sells or furnishes article which, by reason of defective construction or otherwise, is imminently dangerous to life or property, without notice or warning of defect or danger, is liable to third parties who suffer therefrom."
* * * * * * *
"Where act of third person combined with original negligent action caused injury, and result might reasonably have been anticipated by first offender, his negligent act is proximate cause of injury, and intervening cause, in order to supersede original negligence, must have alone produced injury." *Page 761 
The last-quoted part of the syllabi fits the present case perfectly.
[8] In view of the quoted authorities and the facts of this case, we hold that the proximate cause of the accident involved was the mixing of the gasoline with the kerosene and perforce hold that the act of Dupree in selling same was not of such character as to break the chain of causation.
We are aware there are cases that hold differently to the conclusions above stated, but we prefer to follow the reasoning and philosophy of the cases and authorities we have cited to support our conclusions.
We next address ourselves to the plea of contributory negligence urged against Oscar Lee Frazier.
[9] It was Frazier's custom to start fires in his home by the aid of kerosene. Such custom was general in and about the neighborhood in which he lived; in fact, general among rural inhabitants who are not fortunate enough to have natural or artificial gas for fuel. It is not negligence to use kerosene to start a fire. Dronette v. Meaux Bros., 156 La. 239, 100 So. 411; 24 Am.Jur. 620, § 130.
There are many cases arising in other jurisdictions which hold that the use of kerosene in rebuilding or replenishing a partially extinguished fire is negligence as a matter of law, "the live coals or flames furnishing circumstances of imminent danger". 24 Am.Jur. 620, § 130. But, in the Dronette case, supra, it is specifically stated that it was not contributory negligence on plaintiff's part to pour gasoline on live coals believing it to be kerosene. So far as we know this expression of the Supreme Court on the subject is the only one in our jurisprudence. If we chose to do so a decision of this phase of the case could be predicated entirely upon this decision, but we prefer to buttress our conclusion thereon upon different grounds and principles.
[10] We think that Frazier was not called upon to do more than he did to determine if there was any fire in the stove prior to pouring the liquid therein. He observed that the pine splinters had burned and that the wood nearest the door was charred. He saw no evidence of fire either from the front or through the opening at the top. The stove was not giving off heat. He could have done but one thing more. He could have removed the wood from the stove. Few persons, if any, who understand the nature of kerosene would have done this prior to pouring kerosene on the wood. They would have felt perfectly safe in not doing so. It did not reflect lack of due care for Frazier to do no more than he did.
[11] The test of due care in a case of this character is whether the acts done would have been done by an ordinarily careful person, in view of all the facts and circumstances.
However, we do not think it indispensable to a correct determination of the case to decide whether, if the liquid had been pure kerosene, Frazier acted with or without due care before pouring it into the stove. The case really pivots upon the fact that the mixture contained sufficient gasoline content to render its explosive and inflammable potentialities much greater than kerosene.
The immediate cause of the injury to Frazier and the death of his son was not the explosion in the stove but the explosion of the contents of the can. If the liquid had been pure kerosene the flames from the first explosion would not have reached to the can in Frazier's hands. Gasoline is highly volatile. It is shown that the can was about two-thirds full and capped. Vapor was pent therein. When the can was opened naturally the vapor began to escape. It was continuous from the stove to the can. This would not have occurred had kerosene been used.
It is obvious some live coals or embers were beneath the wood and when the liquid spread over them, the heat vapors generated therefrom attained sufficient intensity, in the presence of air, to cause the explosion. If there had been no fire there would not have been any heat, of course; and, consequently, if no heat there would have been no explosion.
John Phillip Frazier was a healthy boy and was mentally and physically well developed. He was apt in school and doubtless a joy to his parents. However, their anguish because of untimely and tragic death is possibly assuaged to some extent by the presence in their home of other children to bless it.
The boy was dressed in his sleeping clothes when the explosion occurred. His clothes were involved in flames from the burning liquid. He was burned badly before the fire was extinguished by his mother and father. He was immediately carried *Page 762 
to a hospital where his sufferings were alleviated as much as medical skill and science could do. Death came at about midnight December 9th. The record does not definitely disclose how much of the time he was rational. He was delirious part of the time. Had he survived he could have recovered a substantial amount for pain and suffering endured during these four days.
[12] The award of damages fixed by the trial judge, to which the parents are entitled, does not appear excessive, as contended. It will not be disturbed. The amount includes that which the deceased could have recovered for pain and suffering to time of his death.
[13] Oscar Lee Frazier was also dressed in his night clothes when the explosion occurred. He was afire all over but fortunately was able to tear the garments from his body before the fire had done its worst. But for this, his injuries would have been much more serious. He was confined in a hospital until February 10th, some ten and one-half weeks. He suffered mainly from second degree burns of the arms and second and third degree burns of the legs. Other burns were painful but not so serious. No evidence is required to prove that from injuries of the character mentioned, the victim suffers intense and agonizing pain for quite awhile. The trial judge, concerning this plaintiff's injuries and their extent, etc., has this to say: "He was again admitted to the hospital at the request of Dr. W.M. McBride of Alexandria, Louisiana, that the scar on one of his knees might be removed and skin graft might be applied. For some reason this was not done and on the day of trial he exhibited quite a scar from the burn which apparently impaired his ability to move about normally. The evidence shows that he is physically disabled to do manual labor because of his condition as a result of the burns received and that he still suffers more or less pain at all times. The opinion of Dr. McBride is that the scar area can be removed and full thickness of skin graft applied which will give him perfect function and no disability whatever, but if the graft is not applied the central area will be a long time healing and will break down at intervals even after healing and there will be some limitation of motion on the flexion of the knee. It is, therefore, established that the present condition of Oscar Lee Frazier will continue for a long while and he will have limitation of motion during the time of recovery, and perhaps after recovery. His injuries are permanent under the proof unless an operation would restore him to normalcy."
Frazier, when injured, was forty-four years old. He was in splendid health and was earning high wages — more than he could have earned but for war conditions. At date of trial he weighed two hundred thirty pounds. To time of trial he had not been able to engage in work of the character he is competent to perform. He was on relief at that time.
[14] We are convinced that if Frazier will submit to the skin graft operation suggested by Dr. McBride, if he has not already done so, his physical condition will soon be such that he can engage in some gainful business or occupation. The award in his favor is not excessive.
For the reasons herein assigned, the judgments appealed from are affirmed with costs.